**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

VISION ONLINE, INC., a Florida corporation, et al.

     Defendants.

No. 6:23-cv-1041-WWB-DCI

---

## RENEWED MOTION FOR PAYMENT OF ATTORNEYS' FEES AND COSTS OF CORPORATE DEFENDANTS, AND RICHARD AND SARA ALVAREZ

Richard and Sara Alvarez (collectively "Individual Defendants") file the instant renewed motion[1] ("Renewed Motion") for an Order authorizing: (1) payment of $172,982.80 from the receivership estate for attorneys' fees and costs incurred by counsel in their representation of Vision Online, Inc. ("Vision Online"); Ganadores IBR, Inc.; Vision Online Digital, LLC; Vision Online English, LLC; and Vision Online Latino, LLC (collectively, "Corporate Defendants") following entry of the Temporary Restraining Order ("TRO"; ECF No. 11) until entry of the Preliminary Injunction ("PI"; ECF No. 52) on July 18, 2023; and (2) payment of $60,616 from Individual Defendants' frozen funds for attorneys' fees and costs incurred by counsel in their representation of Individual Defendants following entry of the TRO through August 28, 2023.[2] Payment of the

---

[1] The Motion for Payment of Attorneys' Fees and Costs of Corporate Defendants, and Richard and Sara Alvarez ("Initial Motion"), ECF No. 80, was denied by the Court on March 11, 2024 without prejudice to filing a renewed motion. ECF No. 120 at 7.

[2] The amounts requested reflect a 20% discount on the total attorneys' fees incurred in this matter. The amount requested for Individual Defendants has been further reduced by $50,000 in retainer funds borrowed by Individual Defendants from friends and family, and

requested funds from Individual Defendants' frozen funds and the receivership estate is appropriate because Individual Defendants have established entitlement to such payment of attorneys' fees for Corporate and Individual Defendants (collectively, "Defendants"), and they have established the reasonableness of the fees requested.

## I.   PROCEDURAL & FACTUAL BACKGROUND

On June 5, 2023, the FTC filed its Complaint and *ex parte* motions for a TRO and for appointment of a Monitor, among other motions. On June 9, 2023, after entry of the TRO and the asset freeze that was imposed on the Individual and Corporate Defendants as a result thereof, Defendants retained Cozen O'Connor. Counsel promptly began analyzing the TRO and other filings, and engaging with Individual Defendants, to fulfill Court-ordered obligations on an expedited basis. *See* TRO, at ¶¶ VII.C, IX.A, VII.A–C, IX.B, XVII, XXIII.

As counsel had no prior engagements with Defendants, this work required counsel to review and analyze an array of materials related to Corporate Defendants' operations and practices, and interview relevant individuals. Similarly, counsel undertook analysis of Individual Defendants' finances and business ventures, including the non-party Receivership Entities. Invoices documenting work performed for Defendants are attached to Ms. Stoppel's Affidavit, which is attached as Exhibit 1. *See* Renewed Motion, Ex. 1 (Meghan Stoppel's Aff.). Notably, counsel performed much of this work at the same time the FTC and the then-Monitor were demanding extensive discovery from Defendants *on an expedited basis*. Counsel also diligently amended the aforementioned documents that

---

$12,000 in funds authorized in the PI for Individual Defendants to withdraw as a home equity line of credit ("HELOC") loan on their personal residence.

they prepared, as necessary, and provided supplemental information as it was made available to counsel.

After advising Defendants as to their pleading options, counsel prepared and filed an Answer on behalf of Defendants. *See* ECF No. 39. Counsel also invested significant time assessing the FTC's case and communicating with Defendants, the FTC, and the then-Monitor in preparation for the PI hearing. This work was required to determine whether such a hearing was necessary and, if so, whether the Defendants would be filing certain materials prior to such a hearing, as required by the TRO ¶ XXIII. *See* Order, ECF No. 18. Ultimately, the parties agreed to a stipulated PI, which was filed on July 14, 2023. The Stipulated PI was entered by the Court on July 18, 2023. Counsel undertook approximately 35.4 hours of work reviewing and discussing with the FTC the proposed stipulated PI. Additionally, counsel spent approximately 65.5 hours between entry of the TRO and entry of the PI communicating with the FTC and the then-Monitor/Receiver to discuss Corporate Defendants' operations and Defendants' finances, and responding to the FTC's discovery requests and the Receiver's information requests. Counsel spent approximately 134.7 hours engaging with Defendants concerning FTC enforcement and litigation procedures, their options, preparing Defendants' Answer to the substantive allegations, following up on operations matters, and matters related to negotiating the PI.

After the PI was entered, counsel negotiated a stipulated resolution with the FTC. Those negotiations were substantially complete by late 2023. Notably, this motion *does not* seek release of funds related to counsel's counseling, negotiating and other work in

connection with the stipulated resolution.[3]  The Joint Motion for Entry of Stipulated Order For Permanent Injunction and Monetary Judgment as to the Corporate Defendants and Alvarez Defendants ("Renewed Motion for Entry of Stipulated Permanent Injunction") is currently under consideration by the Court. *See* ECF No. 121.

## II.   LEGAL AUTHORITY

This Court may exercise its discretion to modify the amount of frozen assets and to authorize use of those assets to pay defendants' attorneys' fees. *See FTC v. USA Fin., LLC*, No. 8:08-CV-899-T-17MAP, 2008 WL 3165930, at *1 (M.D. Fla. Aug. 6, 2008); *FTC v. Click4Support, LLC*, No. CV 15-5777, 2015 WL 7067760, at *6 (E.D. Pa. Nov. 10, 2015) (collecting cases) ("Courts imposing asset freezes . . . have routinely released funds to allow defendants to pay their reasonable attorneys' fees."). This Court may also authorize payment of defendants' attorneys' fees and costs from a receivership estate. *See FTC v. FTN Promotions, Inc.*, No. 8:07-CV-1279-T-30TGW, 2008 WL 2704504, at *2 (M.D. Fla. June 25, 2008).

The Eleventh Circuit and federal trial courts in this District determine whether counsel is entitled to payment of attorneys' fees by looking at the procedural history of

---

[3] This motion does not seek additional funds for work performed beyond that requested in the Initial Motion.  Although counsel performed significant additional work since that date, the amounts requested will help to offset costs incurred during the period when Individual Defendants had substantial need, and counsel continued to provide significant assistance to the Individual Defendants in responding to the actions and requests of the FTC, the Receiver, and counsel for Defendant Robert Shemin.  Since filing the Initial Motion, legal fees have remained a significant hardship for Individual Defendants because no permanent injunction has been issued, Individual Defendants' assets have remained frozen, and what little income the Individual Defendants have been able to obtain has been utilized to cover their immediately living expenses. Release of the requested funds would provide at least some relief toward the significant debt that Individual Defendants have incurred as a result of costs necessary to respond to this action, both on behalf of Individual Defendants and Corporate Defendants.

the action in addition to counsel's documented hours and rates. *See Norman v. Hous. Auth. Of City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988) ("The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates."); *SEC v. Davison*, 2022 WL 2349981, at *1–*4 (M.D. Fla. May 31, 2022), *report and recommendation adopted by*, 2022 WL 2318052 (M.D. Fla. June 6, 2022); *FTN Promotions, Inc.*, 2008 WL 2704504, at *2. Courts balance the equities when exercising their discretion to authorize payment of attorneys' fees – in some cases considering factors such as the sufficiency of the frozen assets and "whether defendants have other available funds by which to pay their attorneys." *FTC v. QT, Inc.*, 467 F. Supp. 2d 863, 866 (N.D. Ill. 2006); *FTC v. IAB Mktg. Assocs., LP*, No. 12-61830-CIV, 2013 WL 2433214, at *2–*3 (S.D. Fla. June 4, 2013). There is not, however, a bright line rule or balancing test to determine whether counsel is entitled to fees. On the contrary, the trial courts in this District have awarded fees to counsel without ever articulating such a rule or test. *See Davison*, 2022 WL 2349981, at *4; *FTN Promotions, Inc.*, 2008 WL 2704504, at *2. Once the court determines that counsel is entitled to payment of attorneys' fees, the court should then determine the reasonableness of the requested hours and rates, along with the appropriate fee award. *See FTN Promotions, Inc.*, 2008 WL 2704504, at *1–*2.

## III.   ANALYSIS

### A. Individual Defendants Have Established Entitlement to Payment of Defendants' Attorneys' Fees, and This Court Should Exercise its Discretion to Award Such Fees.

#### i. Individual Defendants have established entitlement to payment of Defendants' attorneys' fees.

The Eleventh Circuit and the federal trial court in this District have concluded that parties have established entitlement to payment of attorneys' fees from frozen assets, in conjunction with analyzing counsel's rates and hours, by considering the "procedural history of th[e] action," including the history of requests for and actual payment of attorneys' fees in the action. *See Norman*, 836 F.2d at 1303; *Davison*, 2022 WL 2349981, at *1–*4 (determining counsel was entitled to attorneys' fees after discussing procedural history of the action, and history of defendants' requests for and actual payment of attorneys' fees in the action); *FTN Promotions*, 2008 WL 2704504, at *2 (concluding that defendants' counsel was "entitled to an award" of attorneys' fees and costs after analyzing counsel's hours and rates).

In *Davison*, 2022 WL 2349981, at *1–*4, the Middle District court determined that the movant established entitlement to payment from frozen funds from the receivership estate based on facts <u>*less favorable*</u> for the movant in that case than in this case. *See id.* In *Davison*, defendants allegedly ran a Ponzi scheme that raised over $170 million through fraudulent unregistered securities offerings. The court authorized release of attorneys' fees of $50,000, taking into consideration two prior $75,000 payments it had previously authorized. *Id.* at *3–*4. The Court made this determination in recognition of the law firm of Sidley Austin, counsel for the defendants, "undertak[ing] several steps on an urgent basis in pursuit of [movant's] defense, given the emergency nature of the relief requested by the SEC and the extensive allegations asserted by the SEC against [movant]," after the imposition of an asset freeze, among other work. *Id.* at *1–*2. Just as importantly, the Court in *Davison* did not reject, or postpone the consideration of,

6

counsel's request for fees on the basis that there may be insufficient assets to cover *both* the alleged harm and the attorneys' fees.

This Court should reach a similar conclusion. In contrast to *Davison*, to date in this case, *counsel has not received any release of funds* in connection with representing any of the Defendants. Although Defendants made numerous requests to the then-Monitor and the FTC for release of attorneys' fees and costs, and each of the then-Monitor and the FTC indicated that they were open to those requests, none of Defendants' requests were ultimately approved. Defendants also have not made any prior request to this Court for release of attorneys' fees other than in its Initial Motion, which is subsumed by this Renewed Motion.

Further, counsel here engaged in the same type of work as counsel in the *Davison* case, on an "urgent basis" due to the "emergency nature" of the relief requested by the government, after imposiion of an asset freeze. Sidley Austin is also a comparable firm to instant counsel's firm, albeit Sidley Austin is almost triple Cozen O'Connor's size and has a gross revenue almost five times greater than Cozen's, and presumably charges higher rates than Cozen.[4]   Facts, procedural history, and circumstances taken into account—in addition to the fact that counsel has provided detailed records of its hours and rates requested—support a finding by the Court that Individual Defendants have established entitlement to payment of Defendants' attorneys' fees.

---

[4]     See Law.com, Sidley Austin, https://www.law.com/law-firm-profile/?id=274&name=Sidley (last visited Mar. 21, 2024).

### ii. Balancing the equities, this Court should exercise its discretion to award payment of Defendants' attorneys' fees.

When balancing the equities, courts consider factors such as "whether defendants have other available funds by which to pay their attorneys" and, in some cases, the sufficiency of the frozen assets to compensate consumers for their losses. *QT, Inc.*, 467 F. Supp. 2d at 866; *see IAB Mktg. Assocs., LP*, 2013 WL 2433214, at *2–*3; *but see Davison*, 2022 WL 2349981, at *4 (granting request for attorneys' fees without consideration of sufficiency of estate assets to compensate consumers).

### 1. The balance of equities weighs in favor of this Court granting the instant motion because Defendants do not have other available funds to pay attorneys' fees.

Individual Defendants' assets have been frozen for over nine months. They have been living primarily on the kindness of family and incurring increasing debt on their credit cards. And except for the very limited assets that have been carved out of the Stipulated PI, as noted therein, all of the frozen assets will be forfeited in settlement with the FTC. Mr. Alvarez has only recently been able to obtain a sales job that does not cover the Alvarezes' everyday living expenses, let alone their legal fees and costs. Mr. Alvarez submits his Declaration, attached as Exhibit 3, attesting to the same. *See* Renewed Motion, Ex. 3 (Richard Alvarez Declaration).

Further, counsel engaged in good faith negotiations with the FTC and the Receiver regarding the release of funds to pay Defendants' attorneys' fees, and the parties were not able to reach agreement. The circumstances, therefore, merit the Court exercising its equitable power to authorize the payment of counsel's fees.

The FTC stated in a September 27, 2023 email to counsel that it would not oppose a fee request of $50,000 to be paid by the receivership estate for attorneys' fees and

costs incurred in connection with representation of Corporate Defendants. The FTC opposes the release of any additional funds. The FTC has articulated four bases for its objection: (1) counsel's rates, (2) alleged duplicative billing, (3) the $45,000 HELOC loan and the $50,000 in funds held by counsel as a retainer *and provided by friends and family on behalf of Individual Defendants **should*** be enough, and (4) counsel had opportunities to seek funds from Corporate Defendants' assets prior to the entry of the PI.

The FTC's opposition to the release of additional funds (beyond the $50,000 release) is unreasonable as a significant underappreciation of the extent of attorneys' fees occasioned by a case of this nature, complexity, and timing. Nonetheless, in an effort to be responsive to the FTC's objections, counsel revised their invoices to remove certain time spent on behalf of Individual Defendants.[5] Further, although counsel maintain that the work and time expended on this matter were reasonable and necessary, Individual Defendants are requesting fees subject to a 20% reduction to address the FTC's comments about rates and the work undertaken on the matter.

The $50,000 retainer provided to Cozen O'Connor on June 13, 2023 was used to secure counsel for all seven Defendants.[6] Further, the retainer funds were borrowed

---

[5] Charges counsel removed (and have not sought in their Initial Motion or this Renewed Motion) includes time spent in connection with *E&M Estates & Property Management, et al. v. Luis Daniel Padilla, et al.*, pending in the District Court of Harris County, TX, 157th Judicial District; and fees incurred in connection with preparing the Initial Motion. Those fees are identified by grey and yellow highlighting in the invoices attached to the Affidavit of Ms. Stoppel, and total $4,760.00 for Corporate Defendants and $24,606.50 for Individual Defendants. *See* Renewed Motion, Ex. 1.

[6] At the time, the Monitor raised the question of whether Corporate Defendants would be represented by separate counsel. Although counsel were of the view that there was no conflict of interest in representing Defendants together because there was no divergence of interests, counsel nonetheless identified alternate counsel who would be willing to represent Corporate Defendants. However, alternate counsel was not willing to engage without a significant retainer. The Alvarezes did not have any unfrozen assets from which

personally by Mr. Alvarez from friends and family. He is personally indebted to repay them and, accordingly, reported the retainer funds on his personal financial statement submitted to the FTC. Moreover, as detailed above and in the attached Exhibits, $50,000 is nowhere near adequate to cover the reasonable costs and time expended to represent any of the Defendants.

The same is true for the $45,000 the PI permits Individual Defendants to take out from their HELOC. Not only is this amount insufficient to cover the legal fees and costs incurred by counsel in representing Individual Defendants, but the FTC also expected Individual Defendants to use this amount to cover their living costs incurred between issuance of the TRO and the final resolution of this case, which has now been over nine months. Counsel for Defendants requested additional funds in the amount of approximately $125,000 to cover attorneys' fees and costs through the entry of the PI as well as Individual Defendants' living expenses. The FTC declined and indicated they would not agree to release any funds from the frozen assets, and they would only agree to seek Court approval for Individual Defendants to take a $45,000 *HELOC loan* against their personal residence, despite counsel explaining the HELOC was a loan that must be repaid with interest.

The Receiver opposes payment of counsel's attorneys' fees and costs from Corporate Defendants' funds because, under Section XII.G of the PI, such payments are not expressly permitted absent further order of this Court. He also takes the position that

---

to provide the retainer and the then-Monitor refused to release funds from Corporate Defendants' assets for that purpose, saying instead—which is surprising since he raised the question and because Corporate Defendants could not appear in the case without counsel—that Corporate Defendants did not need counsel.

the request should have been made while he was the Monitor in this case, and he echoes the general objections made by the FTC. Defendants dispute any allegation by the FTC or the Receiver that the requests for release of funds is untimely. Counsel engaged in numerous conversations with the then-Monitor and with the FTC regarding the payment of attorneys' fees prior to the entry of the PI, but those conversations resulted in counsel being volleyed back and forth, with no release of funds.  These and other conversations are documented in Ms. Sprinzen's Affidavit, attached as Exhibit 2. *See* Renewed Motion, Ex. 2. (Nicole Sprinzen's Affidavit) ¶¶ 17–36.

The first such telephone call occurred in June 2023, followed by another telephone call on July 3, 2023, and email exchanges on July 17, 2023. *See id.* ¶¶ 17, 18, 23, 24. When counsel first raised the question of payment of Corporate Defendants' attorneys' fees with the then-Monitor in June, he was unwilling to authorize the remittance of any funds for counsel for Corporate Defendants until the initial discovery and information requests from the FTC were satisfied. *See id.* ¶ 17. This work was completed by June 27, 2023.[7] Then, on July 3, when counsel raised the question again during a telephone call, the then-Monitor stated that he would defer to the FTC or the Court as to whether payment was appropriate. *See id.* ¶ 18.

On July 6, 2023, when counsel conferred with the FTC regarding payment of Corporate Defendants' attorneys' fees, the FTC took the position that only the Receiver could authorize payment of counsel's fees under the then-existing TRO. *See id.* ¶ 19.

---

[7] The FTC issued an additional set of interrogatories to Corporate Defendants and an initial set of Interrogatories on Individual Defendants on July 7, 2023. Responses to those interrogatories were served by Defendants on July 12, 2023. Thereafter, counsel for Individual Defendants continued to monitor those responses and provided supplements as necessary on August 17, 2023, to ensure that they were complete and accurate.

According to the FTC, under the TRO, Corporate Defendants' assets were not frozen; however, any expenditure above $5,000 had to be approved by the then-Monitor. As set forth above, the then-Monitor refused to provide that approval, leaving counsel for Defendants between the proverbial "rock and a hard place." *See id.* All the while, informal requests for information and additional discovery requests were rolling in, necessitating counsel's continued active investigation and response, and counseling of clients.[8]

### 2. Although not necessary to grant this Motion, there are sufficient funds to provide consumer redress.

The Court has discretion to grant payment of counsel's fees irrespective of the total value of funds that are available for repayment of customers, but there are sufficient funds available in this case. First, the Complaint does not set forth a dollar amount of alleged consumer financial injury beyond the general statement, "Consumers have suffered tens of millions of dollars of injury." *See* ECF No. 1, at 63. In another FTC case in which the government did not specify an amount for consumer redress, the district court ordered the defendant to pay redress to consumers who could make a valid claim, and set a dollar range for such claims—at the minimum, defendant's profit, and at the maximum, the consumers' spending. *See FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 605 (9th Cir. 1993). If this Court were to adopt a similar approach here in its view of consumer redress,

---

[8] Although counsel has expended significant effort on behalf of the Individual Defendants negotiating a proposed settlement, counsel will not submit a request for payment of those fees to the Court. Upon the entry of the PI and the conversion of the Monitor into a Receiver, the Receiver contacted counsel for Defendants and terminated their services on behalf of Corporate Defendants, stating that he would only retain counsel if he determined he needed to. Accordingly, no attorneys' fees or costs have accrued for counsel's work for Corporate Defendants since July 18, 2023, when the PI was entered.

according to the Monitor/Receiver's Initial Report ("Receiver's Report"), that range would be between $8.8 million and $36.4 million.[9]  *See* ECF No. 62, at 11.

Second, turning to the amount of frozen assets and assets currently collected in the receivership estate, the FTC (and Defendants, jointly) set forth in the Proposed Stipulated Order for Permanent Injunction, Monetary Relief and Other Relief as to Corporate Defendants and Individual Defendants ("Stipulated Permanent Injunction") that the judgment against Defendants will be satisfied by the Individual Defendants remitting approximately $996,863.31 in assets to the FTC and surrendering all assets of the Receivership Entities. ECF No. 121-1, at 13. The FTC anticipates obtaining an additional $35,000 from Defendant Bryce Chamberlain. ECF No. 122-1, at 14. In addition, proceedings continue against co-defendant Robert Shemin, from whom the FTC is seeking additional asset recovery. *See* ECF No. 1, at 15 ("Shemin has netted at least $1 million from the Ganadores scheme.").

Third, since the entry of the PI, the Receiver has been liquidating the estate of Corporate Defendants. To date, the Receiver has received approval from the Court to sell four properties for over $1 million in total. In addition, there are 29 other properties valued at $10.44 million in the receivership estate, all of which the Receiver controls and has indicated he intends to sell. Moreover, since the then-Monitor assumed control of the assets in June 2023, he has collected rent from three rental properties (two Airbnb rentals, and one long-term rental) totaling approximately $145,530. In total, the Receiver stands

---

[9] These totals were calculated based on Vision Online, Inc.'s annual net income and gross income amounts between 2019 and 2023. *See* ECF No. 62, at 11. The Receiver's Report did not provide gross income information for the other Corporate Defendants as "[n]one of these businesses were successful, and all had been dissolved prior to the Monitor's appointment." *See* ECF No. 62.

to collect over $11.58 million in assets. The Court can anticipate that there will be sufficient funds to distribute meaningful redress to any aggrieved customers.

Other federal courts, including the Southern District of Florida, have authorized payment of attorneys' fees even when they found that the amount of frozen funds were insufficient to provide the full amount of consumer redress. In *FTC v. IAB Mktg. Assocs., LP*, the Court unfroze $75,000 for defendants to pay attorneys' fees the day the Court entered the preliminary injunction. *See* No. 12-61830-CIV, 2013 WL 2433214, at *2–*3 (S.D. Fla. June 4, 2013). The Court did so even though "[t]he value of the frozen assets is a mere pittance compared to this enormous sum" of $125 million owed to victims of the alleged scheme, with "the largest value that could be ascribed to the frozen assets [being] approximately $2.812 million [and] [o]f this amount, $438,476 was available for the Receiver to use." *Id.* at *2. The Court reasoned, "Even though the IAB Defendants' monetary liability greatly exceeds the frozen funds, the Court believed that fairness dictated granting the IAB Defendants a reasonable amount to pay attorney fees through the preliminary-injunction hearing . . . because in deciding whether to enter a preliminary injunction, the Court must evaluate the likelihood that the FTC will prevail on the action's merits and balance the equities." *Id.* at *3.

Indeed, "District courts have found that the equities weight in favor of unfreezing a defendant's assets to pay attorney's fees through the preliminary injunction stage." *FTC v. Next-gen, Inc.*, No. 4:18-CV-00128-DGK, 2018 WL 8754140, at *1 (W.D. Mo. Aug. 3, 2018) (*citing IAB*, 2013 WL 2433214, at *3); *see FTC v. Ragingbull.Com, LLC,* No. CV GLR-20-3538, 2021 WL 1240876, at *1 (D. Md. Jan. 25, 2021) (granting release of frozen

assets to pay $300,000 in defendants' attorneys' fees) (citing *IAB*, 2013 WL 2433214, at *3).

### 3. This Court may grant the instant motion before or after entry of the Stipulated Permanent Injunction.

The terms of the PI entered on July 18 permit this Court to grant the instant motion. Once the PI was entered, it was incumbent upon the Receiver to apply to this Court "for prior approval of any debt or obligation incurred by the Receivership Entities prior to the date of [the PI]."[10] ECF No. 52, at 23. The Receiver failed to do so and instead continued to refuse to pay counsel's invoices. "[I]f and when the defendants argue that the provisions made in the preliminary injunction are insufficient to cover the fees being incurred [a] court must consider in this phase whether defendants have other assets available to pay their attorneys [and] the amount needed to compensate consumers." *FTC v. QT, Inc.*, 467 F. Supp. 2d 863, 867 (N.D. Ill. 2006).

There is no requirement in the PI that payments made by the Receiver provide a certain "benefit to the receivership estate," as the Receiver argues in his Response to the Initial Motion.[11] *See* ECF No. 91, at 7. Instead, the Receiver has been tasked in the PI,

---

[10] Section XII.G of the PI provides: "The Receiver shall have the following duties and authority: . . . Make payments and disbursements from the receivership estate that are necessary or advisable for carrying out the directions of, or exercising the authority granted by, this Order, and to incur, or authorize the making of, such agreements as may be necessary and advisable in discharging his or her duties as Receiver. The Receiver shall apply to the Court for prior approval of any payment of any debt or obligation incurred by the Receivership Entities prior to the date of entry of this Order, except payments that the Receiver deems necessary or advisable to secure assets of the Receivership Entities, such as rental payments." ECF No. 52, at 21–23.

[11] Still, counsel *did provide* a benefit to the receivership estate, including: the provision of *extensive* information relating to the identification and status of assets; prompt responsiveness to formal and informal inquiries concerning operations that enabled the

Section XII.D, with the responsibility to "conserve, hold, manage, and prevent the loss of all assets of the Receivership Entities, and perform all acts necessary or advisable to preserve the value of those assets." PI, ECF No. 52, at 22. Barring any language in the PI prohibiting the payment of Defendants' attorneys' fees and costs (and there is none), Individual Defendants may submit, and this Court may properly consider, the Renewed Motion. *See QT, Inc.*, 467 F. Supp. 2d at 867–68.

The Receiver's allegation that counsel should be treated as any other "pre-receivership creditor" is similarly meritless. Additionally, there is nothing in Section XII of the PI, or anywhere else, that requires that treatment. Not even the FTC has argued that counsel should be treated as such. On the contrary, courts have repeatedly found that denying a defendant's request for payment of attorneys' fees *even at the preliminary stages of litigation* could profoundly affect a party's ability to defend itself and the underlying fairness of the proceedings.[12] *See IAB Mktg. Assocs., LP*, 2013 WL 2433214, at *2–*3; *Next-gen, Inc.*, 2018 WL 8754140, at *2; *Ragingbull.Com, LLC,* 2021 WL 1240876, at *1. The Receiver's claim about potential exposure under the Federal Priority Statute is equally unfounded, as the Receiver would be insulated from any such liability once this Court orders the Receiver to pay counsel's fees. Nothing in existing case law

---

then-Monitor to wind them down on an expedited basis, and conserve resources; and the expedient entry of a PI resulting in the conversion of the then-Monitor into a Receiver who could commence consolidating the estate and liquidating assets, as necessary.

[12] In this case, counsel was instrumental in negotiating the very PI upon which the Receiver's authority rests. For the Receiver to now opine that counsel is not entitled to payment for those services—all while collecting payment for his own services—is both audacious and inequitable. "This court's central concern is the fairness of the proceedings. . . . This is a complex legal matter, and lawyers are essential to the presentation of issues related to it." *SEC v. Dowdell,* 175 F.Supp.2d 850, 856 (W.D. Va. 2001) (granting motion for payment of attorneys' fees).

(or the PI) requires this Court to relegate counsel to the "back of the line." This Court, therefore, should reject the Receiver's invitation to treat counsel as any other creditor.

At the current juncture—where the Court is simultaneously considering the Renewed Motion for Entry of Stipulated Permanent Injunction, ECF. No. 121, and the instant motion—the Court should be *more willing to* grant this Motion, the requests in which have been pending since filing of the Initial Motion on September 29, 2023, because counsel's work has led to a negotiated and FTC-approved proposed settlement. Moreover, granting the Motion would be appropriate even after entry of a stipulated permanent injunction in this case. The federal trial court in this District in *Davison* granted in part the motion to modify asset freeze authorizing payment of attorneys' fees <u>*after entry of the consent judgment against the movant*</u>. *See* 2022 WL 2349981, at *3–*4; *see also FTC v. FTN Promotions, Inc.*, No. 807-CV-1279-T-30TGW, 2008 WL 2704504, at *2 (M.D. Fla. June 25, 2008) (authorizing payment of defendants' attorneys' fees from receivership estate or unfrozen assets after entry of preliminary injunction and before entry of a permanent injunction); Permanent Inj., Dec. 30, 2008; ECF No. 284. The Renewed Motion for Entry of Stipulated Permanent Injunction, by its terms in Section XII.L, also provides for the grant of the instant Motion either before or after the entry of a stipulated permanent injunction. *See* Renewed Motion, ECF. No. 121-1 at 23.

### B. Counsel's Hours and Rates Are Reasonable.

Having established that Individual Defendants are entitled to payment of Defendants' attorneys' fees, and that this Court should exercise its discretion to authorize payment of such fees from frozen assets and the receivership estate, this Court should next determine the reasonableness of the requested hours and rates, and then determine

what an appropriate fee award may be. *See FTN Promotions, Inc.*, 2008 WL 2704504, at *1 (authorizing payment of $242,147 in attorneys' fees and costs for work done over the course of five months, to be paid from the receivership estate or unfrozen assets); *FTC v. Click4Support, LLC*, No. CV 15-5777, 2015 WL 7067760, at *6 (E.D. Pa. Nov. 10, 2015). The Eleventh Circuit employs the lodestar method in determining whether attorneys' fees and costs are reasonable. *See Norman v. Hous. Auth. of City of Montgomery*, 836 F.2d 1292, 1298–99 (11th Cir. 1988). "The starting point in any determination for an objective estimate of the value of a lawyer's services is to multiply hours reasonably expended by a reasonable hourly rate." *Id.* at 1299. Counsel must provide "specific and detailed evidence from which the court can determine the reasonable hourly rate," "maintain[ing] records to show the time spent on the different claims, and the general subject matter of the time expenditures.*" Id.* at 1303. Counsel's invoices, attached as to Ms. Stoppel's Affidavit, provide that specific and detailed documentation in this case. *See* Renewed Motion, Ex. 1.

As demonstrated below, counsel's hourly rates are reasonable and commensurate with the specialized experience counsel offers, the extent of their experience, and the results that counsel has achieved for Defendants in this matter. The number of hours is also reasonable, particularly when examined in the context of the seriousness of the allegations, the complexity of issues, the FTC's litigation strategy, expedited discovery, and other timelines. Counsel ensured that tasks were handled by an attorney or attorneys of appropriate experience, that they coordinated with each other to ensure there was no duplication of work, and that no time was wasted updating members of the team.

      **i.     Counsel's hourly rates are reasonable.**

The Eleventh Circuit has recognized that "[a] reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." *Norman*, 836 F.2d at 1299. In addition to an affidavit of the attorney performing the work, satisfactory evidence should "speak to rates actually billed and paid in similar lawsuits," which "may be adduced . . . by opinion evidence." *Id.*

Defendants in this matter appropriately retained counsel experienced in civil and criminal federal court litigation and procedure, including within this District, and in consumer protection law enforcement actions. *See* M. Stoppel Aff. ¶¶ 2–3, 10–14. Defendants' selection of counsel should not be disturbed.[13]

To find a comparable case justifying the reasonableness of counsel's rates in this case, the Court need look no further than *FTC v. FTN Promotions, Inc.* from the Middle District of Florida. *See* 2008 WL 2704504, at *1. In *FTN*, attorneys with expertise in

---

[13] Courts recognize that defendants in FTC enforcement actions should be afforded counsel of their choice, and neither the FTC nor other parties (such as a Monitor or Receiver) should be allowed to interfere in a defendant's selection of counsel. *See, e.g.*, *FTC v. Atlantex Assocs.*, 872 F.2d 966, 969 (11th Cir. 1989) ("[W]e note that the district court modified its original freeze order to allow payment of defense counsel *of appellants' choice.*") (emphasis added).

The then-Monitor suggested that Defendants hire a particular attorney to represent them in the instant litigation. Putting aside whether it is appropriate for the attorney who has been appointed Monitor in an FTC enforcement action to recommend counsel for defendants, the attorney recommended by the then-Monitor would have had a conflict of interest in the matter. That attorney had been retained by Corporate Defendants months prior to the commencement of this suit to provide compliance advice concerning the language of the student contracts and the substance of certain marketing presentations given by Vision Online/Ganadores employees to students. While Defendants believed at the time that the lawyer's advice was sound and believed they were complying with consumer protection laws, the FTC and the then-Monitor clearly took issue with that viewpoint, as those were the materials that formed the bases of the FTC's allegations and the then-Monitor's concerns.

government investigations and litigation from the Washington, D.C. and New York offices of Manatt, Phelps & Phillips, LLP ("Manatt"), an Am Law 200 firm, represented six corporate defendants in this District in a suit similarly brought by the FTC on an expedited timeline. *See* Defs.' Appl. Payment Attys' Fees & Costs ("Fees Appl."), 1–6, 23, ECF No. 201. As in this case, *FTN* involved an *ex parte* TRO and a subsequent PI. *See id.* at 3–6. Defendants in *FTN* sought the release of $561,051.55 for work performed over six months to supplement the $323,381.87 that the FTC had already approved to be released in order to fully compensate Manatt for $884,433.42 in legal fees and costs incurred during that time period.[14] *See* Fees Appl., at 2. After considering counsel's request, the Court deducted costs (*e.g.*, for photocopying, travel) and authorized release of $242,147.30 from the frozen accounts of Individual Defendants, and held that the balance of fees and costs could be paid from the receivership estate, unfrozen assets of Individual Defendants, Corporate Defendants' stockholders, or Individual Defendants' friends or family. *See* 2008 WL 2704504, at *1–*2. Ultimately, the *FTN* attorneys' Court-adjusted rates at the time of the 2007 FTC litigation ranged from approximately $300/hour to $410/hour. *Id.* at *1.

In terms of comparable skills and experience, *FTN* counsel's experience with federal court litigation and FTC investigations is akin to counsel's experience in federal litigation, with particular expertise in civil and criminal fraud and consumer protection. This matter was directed and primarily handled by Ms. Sprinzen and Ms. Stoppel. The firm

---

[14] Unlike Cozen's request, Manatt's request did not include any fees or costs associated with local counsel, as Manatt did not provide local counsel to the defendants in FTN, and instead hired two separate firms that acted as local counsel in the matter. *See id.* at *1 n.1.

biographies of Ms. Sprinzen and Ms. Stoppel demonstrate counsel's experience and background in the subject matter of the instant case.[15] By one measure of reputation, Cozen O'Connor ranks similarly on The American Lawyer's Am Law rankings (#73) as the *FTN* attorneys' firm (#109).[16]

The attorneys' rates paid in *FTN* also support the reasonableness of counsel's rate in the instant case. If this Court were to adjust the hourly rates ultimately approved by the Court in *FTN* to account for inflation over the last 15 years, the hourly rates approved by the Court in *FTN* would range from $421/hour to $575/hour.[17] *See* 2008 WL 2704504, at *1. In *FTN*, the Court adjusted the attorneys' rates and authorized payment of fees at a lower rate based in part by looking to the rates of the two Tampa firms that acted as local counsel for the defendants at certain points during the lawsuit. *Id.* at *2. In the instant

---

[15] Nicole H. Sprinzen, a shareholder with the firm, has 24 years of experience and is a former federal fraud prosecutor who has long maintained a criminal and civil fraud federal defense practice. *See* Cozen O'Connor, Nicole H. Sprinzen bio, https://www.cozen.com/people/bios/sprinzen-nicole. Meghan Stoppel, a member-level partner with the firm, has practiced for 15 years and is a former Consumer Protection Division Chief with the Nebraska Attorney General's Office, with significant experience handling consumer protection cases. *See* Cozen O'Connor, Meghan Stoppel bio, https://www.cozen.com/people/bios/stoppel-meghan. Karen Williams, also a member-level partner with the firm, has practiced for 14 years and has significant federal fraud defense trial experience. *See* Cozen O'Connor, Karen Williams bio, https://www.cozen.com/people/bios/williams-karen. An associate of four years of experience, Emily Yu was the primary associate working on the case. *See* Cozen O'Connor, Emily Yu bio, https://www.cozen.com/people/bios/yu-emily. Another associate, Keturah Taylor, who has six years of experience, provided assistance on as-needed basis. *See* Cozen O'Connor Keturah Taylor bio, https://www.cozen.com/people/bios/taylor-keturah.

[16] *See* Law.com, Cozen O'Connor, https://www.law.com/law-firm-profile/?id=1728&name=Cozen-O%27Connor (last visited Sept. 29, 2023); Law.com, Manatt, https://www.law.com/law-firm-profile/?id=197&name=Manatt (last visited Sept. 29, 2023).

[17] Bureau of Labor Statistics inflation calculator: https://data.bls.gov/cgi-bin/cpicalc.pl (last visited Sept. 29, 2023).

case, unlike in *FTN*, a Cozen attorney who is a young member in the firm, based in the firm's Miami office and admitted to practice in this District, has served as local counsel, so no such downward adjustment of fees based on local counsel's lower rates is required. Rather, Cozen's national footprint allowed counsel to quickly identify and provide local counsel at reduced cost and without the need to hire additional law firms, and without the concomitant learning curve that accompanies hiring additional law firms. Moreover, applying the inflation rate to the total fees and costs billed by Manatt in *FTN*, and the amount sought by Mannatt in their application, counsel's fees are clearly reasonable.

Although counsel in *FTN* opted to oppose entry of a preliminary injunction, while Defendants chose to stipulate to the PI in this matter, the time expended and fees sought by counsel reflects Defendants' cost savings in negotiating that PI and is commensurate with the posture and progression of this case.[18] Even if comparatively adjusted rates are used, $172,982.80 is properly released for Corporate Defendants' representation, and $60,616 is properly released for Individual Defendants' representation.

---

[18] The Receiver in his First Fee Application charged his time at $395 per hour. *See* Monitor/Receiver's Verified First Appl. Payment Services Rendered Reimbursement Costs Incurred 2, ECF No. 63. This should not be a comparable metric for considering the reasonableness of attorney rates in this case because, in that role, the then-Monitor now-Receiver is working as a representative of the Court. Accordingly, charging rates that are closer to what would be charged by a lawyer working on behalf of the government is appropriate for those roles. The same is true for the lawyers that the Receiver hired at his own law firm, Akerman, who charged a blended hourly rate of approximately $573.46, and the business transaction lawyers he hired to document debts of companies that the Receiver has stated he intends to wind down, who charged a blended hourly rate of approximately $339.69. *See* Receiver's Verified First Fee Appl. Payment Services Rendered Akerman LLP 2, ECF No. 76; Receiver's Verified First Fee Appl. Payment Services Rendered Kass Shuler 2, ECF No. 77.

> **ii.   Counsel's time expended in representing Defendants is reasonable.**

After establishing the reasonableness of counsel's rates, "[t]he next step in the computation of the lodestar is the ascertainment of reasonable hours." *Norman*, 836 F.2d at 1301. Despite the FTC's objection, the extent of work performed by counsel in this matter is imminently reasonable. Indeed, as one federal court has recognized in an FTC matter like this one, permitting the FTC "to decide what fees are, and are not, reasonable, . . . is like putting the fox in charge of the henhouse." *FTC v. Am. Tax Relief, LLC*, 751 F. Supp. 2d 972, 987 (N.D. Ill. 2010) (granting defendants' request to unfreeze assets to pay reasonable attorneys' fees and costs, explicitly rejecting FTC's request to "cap" funds).

Attached to the Affidavit of Ms. Stoppel is a detailed breakdown of counsel's hours. *See* Renewed Motion, Ex. 1. Counsel's hours are separated by time spent on items related to their representation of Corporate Defendants, totaling 308.2 hours, and those related to Individual Defendants, totaling 212.60 hours as of August 28, 2023. This commitment of time was necessary to facilitate Defendants' compliance with this Court's TRO, FTC's demands, and then-Monitor's requests, as well as to provide Defendants with sound legal counsel and proper representation. It was necessary for counsel to obtain adequate information about Defendants within the first few weeks of their engagement to accurately prepare the Court-ordered Financial Statements, counsel the Defendants as to their options for responding to the FTC's Complaint, and to respond to the FTC's expedited discovery requests and the then-Monitor's requests for information. This work, and the work performed by counsel in both July and August 2023, is detailed in the Exhibits.

Counsel took care to ensure that specific tasks were handled by an attorney or attorneys of appropriate experience and seniority throughout the litigation. Strategy and client counseling was handled by Ms. Sprinzen and/or Ms. Stoppel, as appropriate given the complexity of the issue. The primary associate on the case, Ms. Yu, handled the initial drafting, with occasional assistance from Ms. Taylor, the other associate on the matter, or Ms. Williams, depending on the timeframe for completion and complexity of the issues involved, with review by Ms. Stoppel or Ms. Sprinzen. Ms. Sprinzen and Ms. Stoppel coordinated with each other and the other attorneys working on the case clearly and to the extent necessary to ensure there was no duplication of tasks, that counsel were able to "divide and conquer" tasks, and that no time was wasted updating members of the team by repeated or seriatim phone communications.

Despite counsel's confidence that counsel's rates and handling of the work in this matter is reasonable, in an effort to be responsive to the FTC's comments and recognizing that counsel tend to reduce rates when handling FTC enforcement matters, Defendants have reduced their request for fees by 20%.

## IV.    CONCLUSION

For the foregoing reasons, Individual Defendants move for an Order authorizing payment of $172,982.80 from Corporate Defendants' funds for attorneys' fees and costs, and payment of $60,616 from their frozen funds for attorneys' fees and costs.

## <u>LOCAL RULE 3.01(g) CERTIFICATION</u>

Pursuant to Local Rule 3.01(g), counsel certifies that counsel has conferred with the opposing parties, and that the parties have not reached resolution on the motion for payment of attorneys' fees and costs for Corporate Defendants or Individual Defendants.

The FTC and Receiver have stated that they object to the relief sought for the reasons set forth above. Counsel for Mr. Shemin has stated that they do not have an objection to the Motion. Mr. Chamberlain has not responded to the Defendants' counsel's requests for his position with respect to the Motion. The conference occurred via electronic mails exchanged between March 27 and April 1, 2024.

DATED: April 1, 2024

*/s/ Arielle S. Eisenberg*
COZEN O'CONNOR
Arielle S. Eisenberg
Meghan Stoppel
Nicole H. Sprinzen
200 South Biscayne Blvd, Suite 3000
Miami, FL 33131
(786) 871-3953
AEisenberg@cozen.com
*Counsel for Richard and Sara Alvarez*

## CERTIFICATE OF SERVICE

I certify that on April 1, 2024, a copy of the foregoing was served via the ECF system or email to Virginia G. Rosa, vrosa@ftc.gov; J. Ronald Brooke, Jr., jbrooke@ftc.gov; Mark J. Bernet, mark.bernet@akerman.com; Jason McNeill, mcneill@mvmlegal.com; and Bryce Chamberlain, chamberlainbryce@gmail.com.

*/s/ Arielle S. Eisenberg*
Arielle S. Eisenberg