UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.                              Case no. 6:23-cv-1041-WWB-DCI

VISION ONLINE, INC., et al.,

        Defendants.

_____/

## RECEIVER'S UNOPPOSED VERIFIED THIRD APPLICATION FOR PAYMENT FOR SERVICES RENDERED AND REIMBURSEMENT FOR COSTS INCURRED

Mark J. Bernet (the "Receiver"), as receiver for the Defendants Vision Online, Inc., Ganadores IBR, Inc., Vision Online Digital, LLC, Vision Online English, LLC, and Vision Online Latino, LLC, as well as for the non-parties  Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC and XPI Investments, LLC (collectively the "Receivership Entities"), files his third application for payment for services rendered and reimbursement for costs incurred.  As discussed in more detail below, the Receiver requests payment of $99,026.50 in fees, and reimbursement of $463.71 for expenses, incurred during the period commencing November 1, 2023, through and including April 5, 2024 (the "Third Interim Fee Period").  **The Receiver reports to the Court that the relief requested herein is not opposed by any of the parties.** The Receiver submits the following in support of his Third Interim Fee Application.

I.       INTRODUCTION

A.       The Relief Requested

1.       By this Third Application the Receiver requests authority to pay himself $99,026.50 for his services rendered as receiver during the Third Interim Fee Period.  The Receiver also requests authority to reimburse himself $463.71 for costs and expenses incurred.  The fees represent 250.7 hours expended by the Receiver over the Third Interim Fee Period at a proposed hourly rate of $395.00.[1]

2.       The services rendered during the Third Interim Fee Period are discussed in greater detail in Section II below.  Additionally, the Receiver has filed a summary of the billable time expended on this case, together with a detailed billing log, recorded in tenths of an hour, for all tasks undertaken.  See Exhibit "A."

3.       All the services for which the Receiver requests compensation were rendered solely in connection with this case and solely by the Receiver.  All the services that are the subject hereof were rendered during the Third Interim Fee Period.

4.       The Receiver received no retainer for professional fees and costs in connection with his services herein.  The Receiver has agreed to wait for a Court order before taking payment.  This is the Receiver's third request for payment.  The Court previously awarded the Receiver the following:

- By its *Order* entered on November 20, 2023 (doc. no. 108), the Court awarded the Receiver $82,871.00 in fees and $15,803.81 as reimbursable expenses.

---

[1] The proposed hourly rate represents a discount of over $400.00 from the Receiver's 2023 standard rate of $860.00/hour.  The Receiver's law firm, Akerman, increased his standard hourly rate for 2024 to $960/hour.

- By its *Order* entered on May 31, 2024 (doc. no. 150), the Court awarded the Receiver $93,457.00 in fees and $2,186.81 as reimbursable expenses.

5.      The Receiver respectfully submits, considering the difficult, complex and time-consuming nature of this case, that the requested compensation is fair and reasonable.

        B.      <u>The Background of the Case</u>.

The Plaintiff commenced this case by filing a Complaint (doc. no. 1) on June 5, 2023, alleging that the Defendants[2] operated as a common enterprise to engage in a business or business venture in violation of (i) Section 5 of the FTC Act, 15 U.S.C. §45(a), (ii) the Business Opportunity Rule, 16 C.F.R. Part 437, (iii) the Cooling Off Rule, 16 C.F.R. Part 429, and (iv) the Consumer Review Fairness Act of 2016, 15 U.S.C. §45b.[3]

On June 7, 2023, the Court entered an *Order* (doc. no. 11) constituting a temporary restraining order, which was extended by the Court's June 16, 2023 *Order* (doc. no. 19) (together the two orders shall be referred to as the "TRO").   Among other things, the TRO enjoined the Defendants from engaging in, or directing, any business activities that violated any of the federal laws and rules mentioned above.  The TRO also appointed Mark J. Bernet as a temporary monitor to review, monitor and analyze the

---

[2] The term "Organizational Defendants" means Defendants Vision Online, Inc., Ganadores IBR, Inc., Vision Online Digital, LLC, Vision Online English, LLC and Vision Online Latino, LLC.  The term "Individual Defendants" means Defendants Richard Alvarez, Sara Alvarez, Robert Shemin and Bryce Chamberlain.
[3] Discussions concerning these statutes and regulations are contained in the *Receiver's Initial Report* (doc. no. 62), filed August 4, 2023.

business practices of the Organizational Defendants to and recommend whether they could be operated "legally and profitably."

By his June 15, 2023 *Notice of Expansion of Monitorship* (doc. no. 18), and as authorized by the TRO,[4] the Monitor expanded the monitorship to include Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC, and XPI Investments, LLC, (the "Additional Monitored Entities" or the "Additional Receivership Entities").   The Organizational Defendants and the Additional Monitored Entities collectively are referred to as the "Monitored Entities" or as the "Receivership Entities."

On July 6, 2023, the FTC and the Defendant Chamberlain filed a *Joint Stipulation to Entry of Stipulated Preliminary Injunction Order as to Defendant Bryce Chamberlain* (doc. no. 31), by which they requested that the Court enter an agreed preliminary injunction pertaining to Chamberlain. The Court has approved the stipulation.

On July 26, 2023, the FTC and the Defendant Shemin filed a *Joint Stipulation to Entry of Stipulated Preliminary Injunction as to Defendant Robert Shemin* (doc. no. 56), by which they requested that the Court enter an agreed preliminary injunction as to Shemin.   The Court has approved the stipulation.

---

[4] The provision is contained in the June 7, 2023 *Order*, beginning on page 22.

On July 14, 2023, the FTC, the Organizational Defendants, and the Individual Defendants R. Alvarez and S. Alvarez filed a *Joint Stipulation to Entry of Stipulated Preliminary Injunction Order as to Defendants Vision Online, Inc., Ganadores IBR, LLC, Vision Online Digital, LLC, Vision Online English, LLC, Vision Online Latino, LLC, Richard Alvarez, and Sara Alvarez* (doc. no. 47) requesting that the Court enter an agreed preliminary injunction pertaining to the Organizational Defendants and the Individual Defendants R. Alvarez and S. Alvarez. The Court approved the stipulation by its order dated July 18, 2023 (doc. no. 52). This order hereafter will be referred to as the "Preliminary Injunction." Among other things, the Preliminary Injunction appointed the Monitor as receiver for the Receivership Entities.

By his July 28, 2023 *Notice of Expansion of Receivership* (doc. no. 58), and as authorized by the Preliminary Injunction, the Receiver expanded the receivership to include Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC, and XPI Investments, LLC, (the "Additional Receivership Entities").

On March 14, 2024, the FTC, the Organizational Defendants, and the Individual Defendants Richard Alvarez and Sara Alvarez filed a *Joint Motion for Entry of Stipulated Order for Permanent Injunction and Monetary Judgment as to the Corporate Defendants and Alvarez Defendants* (doc. no. 121). The same day, the FTC and the Individual Defendant Chamberlain filed a *Joint Motion for Entry of Stipulated Order for Permanent Injunction and Monetary Judgment as to Defendant Chamberlain* (doc. no. 122). By these joint motions the parties requested entry of orders from the Court approving and ordering a settlement between those parties involving, among other things, a permanent injunction and a money judgment for over $29 million (with significant

portions suspended assuming the Settling Defendants' compliance with the provisions of the proposed order approving the settlement).  By its *Order* dated August 2, 2024 (doc. no. 155), the Court denied the motions without prejudice, stating that "[t]he parties' Motions fail to provide sufficient argument or evidence to justify the requested relief under [15 U.S.C. §§53(b) & 57b]."  The Court further directed the parties to show cause why the case should not be dismissed for failure to comply with Local Rule 3.09(b).  On August 12, 2024, the Court discharged its order to show cause and directed the FTC, the Alvarez Defendants and Chamberlain to file an amended motion seeking approval of their settlement.

The Receiver has made and maintained detailed records of his activities during the Third Interim Fee Period.  Annexed as Exhibit "A" is a statement showing (i) the time spent by the Receiver on each task he performed, recorded in tenth-of-an-hour time increments, (ii) the date of each task, and (iii) a description of each task.[5]  Exhibit "A" also shows the Receiver's actual out-of-pocket expenses incurred during the Third Interim Fee Period.  Exhibit "A" was prepared by the Receiver in the ordinary course of business, as part of his regularly conducted business activities.  Exhibit "A" was made by the Receiver.  Each entry was made at or near the time of each event described.  Exhibit "A" has been maintained by the Receiver, and it is his usual practice to make and maintain such records, and to retain custody and control over such records.

---

[5] In this regard, the Receiver generally has recorded, and seeks compensation for, only approximately 90 percent of the actual time he spent on the case.

II.   EVENTS OF THE MONITORSHIP/RECEIVERSHIP

The Receiver devoted a significant amount of time to this matter during the Third Interim Fee Period, handling diverse issues, including the following.

A.   Reports.

The Receiver began preparing his initial report during the First Interim Period, and then finalized and filed it during the Second Interim Period.  As is his custom, the Receiver circulated a draft of the report to all counsel prior to filing and invited their comments and questions. All parties provided comments.  The Receiver evaluated them and then made certain changes to the report before filing.  However, the Receiver did not accept all of the requested changes,[6] and as a result, after the Receiver filed his report the Alvarez Defendants and the Defendant Shemin filed objections to certain portions with which they disagreed.  Neither the local rules nor the Court's orders contemplate that parties may object to the Receiver's reports, nor do they contemplate that the Receiver may respond to any such objections.  Accordingly, after reviewing the objections the Receiver prepared a short response advising the Court that he would not file a substantive response to the Defendants' objections unless specifically requested by the Court to do so.

Additionally, during the Third Interim Fee Period the Receiver prepared the *Receiver's Second Interim Report, Concerning the Properties and Tax Concerns* (doc. no. 128),[7] in which he provided to the Court and the parties a detailed analysis of the

---

[6] In both cases, the Receiver viewed the requested changes either as inaccurate or as attempts to "spin" certain actions of the Individual Defendants in a more favorable light.
[7] The Receiver filed his Second Interim Report with the Court on April 9, 2024, which is four days after the conclusion of the Third Interim Fee Period.

7

various real properties owned by the Receivership Entities.  The Receiver also included a discussion concerning tax issues associated with Vision Online's pre-receivership tax returns that may have improperly reported or accounted for distributions from Vision Online.  Finally, the Receiver attached his bank account ledgers for the Receivership Entities showing all income and expenditures during the case.

B.    Real Property Analysis, Sales.

The Receiver continued to devote significant time analyzing various properties owned by Vision Online, Ganadores, and the Additional Monitored Entities, as well as joint venture arrangements in which the Monitored Entity Oak Homes participated. As noted in the *Monitor's/Receiver's Initial Report* (doc. no. 62), Vision Online engaged in a real estate coaching business, a real estate investing business, and a real estate lending business.  The revenue source for purchasing all of the properties was Vision Online's real estate coaching business; Vision Online then used those funds to purchase properties in its own name, or it "loaned" money to affiliates to enable them to purchase real estate.  The loans were poorly documented, which caused concern that there was no enforceable repayment obligation.[8]  The Receiver hired counsel to document the transactions as lines of credit loans secured by recorded mortgages.  This was accomplished during the First Interim Fee Period.

Additionally, several of the properties were under construction, which required ongoing funding from Vision Online.  The Receiver therefore had to review construction plans and authorize advances on the various lines of credit to fund the

---

[8] Vision Online had created no promissory notes or other written documents or instruments to evidence the loans; instead, money transferred from Vision Online was simply recorded as intercompany transfers on Vision Online's income statement.

construction.  The Receiver also analyzed the various properties with an eye toward liquidation; this involved online research to determine recent sale prices of comparable properties, as well as discussions with real estate brokers and an auctioneer.  The properties are identified as follows:

1.  <u>Lehigh Acres</u>.  Prior to this lawsuit the Defendant Vision Online transferred money to the non-party XPI Investments, LLC to enable it to purchase two undeveloped lots in Lehigh Acres, Florida.[9]  The lots were contained within a newly platted subdivision, although few homes had been constructed.  The two lots were "spec properties" located within a "hoped for" subdivision that had not developed and was not likely to develop any time soon.  XPI intended to build residential homes on the lots but the Receiver, in his business judgment, determined that this was not an appropriate plan for a company in receivership.  During the Second Interim Fee Period, with the Court's approval, *see* October 6, 2023 *Order* (doc. no. 90), the Receiver listed the Lehigh Acres lots for sale, negotiated a contract to sell them, worked to clear title defects from the lots, prepared and filed a motion seeking a court order authorizing a sale, and then sold the lots for $38,000, which was the same price XPI paid to acquire them.

2.  <u>Lady Lake</u>.  Prior to this lawsuit the Defendant Ganadores IBR became a 50 percent joint venture partner with a third party named JC Panoramic Investments LLC.  The joint venture purchased two parcels of real property in Lady Lake, Florida, for $90,000.  Vision Online funded $45,000 of the purchase price by

---

[9] The Receiver designated XPI as a Receivership Entity, as permitted under the TRO. *See Notice of Expansion of Receivership (doc. no. 58)*.

advancing that amount to Ganadores, while Panoramic contributed the other $45,000. Shortly before the Plaintiff commenced this lawsuit Ganadores and Panoramic determined to terminate their joint venture partnership, with Ganadores taking title to one of the two lots while Panoramic took title to the other.

The Receiver documented Vision Online's transfer of money to Ganadores for the Lady Lake Lot with a revolving line of credit promissory note secured by a mortgage on the lot. Thereafter, in January 2024 the Receiver listed Ganadores's lot in Lady Lake for sale. The Receiver entered into a contract with a third party to sell the lot for $50,000. The Receiver then filed a motion with the Court requesting authority to sell the lot (*see* doc. no. 123), and the Court granted the motion by order entered on March 20, 2024 (doc. no. 124). The sale subsequently closed.

3.   <u>West Palm Beach</u>.  Prior to this lawsuit Vision Online advanced money to the (now) Receivership Entity Xebec Group, LLC to enable it to purchase property located at 4444 Washington Road, West Palm Beach, Florida (the "WPB Property"). Vision Online's plan was to fund a complete demolition of the existing structure and then construct a new home. Construction was in its final stages when Vision Online and Xebec went into receivership in this case. The WPB Property, which is located 1.1 miles from Mar-a-Lago, is in a neighborhood populated with older homes with values in the $2 - $3 million range. The new home built with Vision Online's money, however, is modern in character and thus does not "fit" within the existing neighborhood. This became a problem when the property was listed for sale.

Prior to this lawsuit Xebec had listed the WPB Property for sale for $5.2 million, but there was no interest at that price level.[10]  After conducting a fair amount of market research, the Receiver lowered the price to $4.7 million, but again there was no interest.  The Receiver lowered the price a second time at the end of the Third Interim Fee Period which, coupled with the onset of the Spring/Summer selling season, caused an uptick in interest from potential purchasers.  With the Court's approval, the Receiver sold the WPB Property after the Third Interim Fee Period.

4.  <u>Delray Beach</u>.  Prior to this lawsuit Vision Online advanced money to XPI to enable it to purchase property at 223 NW First Avenue, Delray Beach, Florida (the "Delray Beach Property").  XPI assumed an eight percent mortgage on the property with a principal balance of approximately $655,000 and also advanced another $445,000 to meet the purchase price and related closing expenses.

The Delray Beach Property was built initially in the 1930s.  It is located approximately one mile from the Atlantic Ocean.  The Defendant Alvarez intended that Vision Online would fund extensive renovations to the property to increase its value, and then sell it.  However, Alvarez did not consider that the property is located within a designated Historic District in the City of Delray Beach.  This

---

[10] Feedback from other realtors was that (i) the price was too high, and (ii) the property was a "white elephant" because it did not fit into the neighborhood architecturally.

designation severely restricted the ability to renovate the property, which in turn negatively affected its value.[11]

The Receiver listed the property for sale and ultimately received an offer for $930,000.  The Receiver filed a motion with the Court seeking authority to sell the property for $930,000 (*see* doc. no. 115).  The Court granted that motion by its order dated February 15, 2024 (doc. no. 117).  The sale closed later in the Third Interim Fee Period.

5.   Lake Mary.  Prior to this lawsuit Vision Online advanced money to XPI to enable it to purchase property located at 304 E. Greentree Lane, Lake Mary, Florida (the "Lake Mary Property").  The purchase price was $695,000.  The Lake Mary Property required extensive rehabilitation, which was ongoing as of the Receiver's appointment.  The Receiver determined that the projected value of the Lake Mary Property would not cover the costs associated with completing construction, and he therefore scaled back the remaining construction to reduce costs.  The Receiver listed the property for sale for $2.2 million, and subsequently reduced the price to $1,995,000.

The Lake Mary Property is over 6,600 sq. ft. sitting on 1.1 acres and includes seven bedrooms and five bathrooms. The Receiver has described the Lake Mary Property as a "Frankenstein House" because it includes numerous additions to the original structure that do not consider "flow."[12]  The Lake Mary

---

[11] A complicating factor was that when XPI purchased the Delray Beach Property the closing agent neglected to obtain necessary consents from the seller.  Fixing this oversight required additional effort by the Receiver.

[12] For example, the kitchen is on the south side of the house but the nearest bathroom is at least 20 yards away.

Property is worth less than the total amount of money invested into it.  It remains listed for sale, while the Receiver continued during the Third Interim Fee Period to analyze possible sales strategies.

6. <u>Commercial Office Building, Colonial Drive</u>.  Prior to this lawsuit Vision Online purchased a commercial office building located at 733 W. Colonial Drive, Orlando, Florida (the "Colonial Drive Property").  The purchase price was $910,000, with Vision Online making a down payment of approximately $200,000 and taking out a mortgage loan for approximately $725,000.  As of the Receiver's appointment the Colonial Drive Property was listed for sale for $1.4 million, but there was little interest at that price.  During the Third Interim Fee Period, and after conducting further market analysis, the Receiver reduced the listing price to $1,200,000.  The Colonial Drive Property was sold, with the Court's approval, after the conclusion of the Third Interim Fee Period.

7. <u>Puerto Rico Properties – Key In Homes</u>.  Prior to this lawsuit Vision Online advanced funds to the (now) Receivership Entity Key In Homes, LLC, to enable it to purchase property located at 802 Calle Aguamarina, Isabella, Puerto Rico (the "Aguamarina Property") and 52 Avenue Munoz Rivera, Apt. 1802, Condominium Aquablue, San Juan, Puerto Rico (the "Aquablue Property").  The Aguamarina Property was a "container home" that was constructed onsite from a shipping container with funds from Vision Online (Vision Online has advanced $800,000 for the acquisition and development of the Aguamarina Property).  The Aguamarina Property presently is operated as an AirBnB and generates gross income of approximately $70,000 per year.  The Aquablue Property is a residential

condominium unit that is leased to a tenant.  During the Third Interim Fee Period the Receiver analyzed the relevant real estate markets and interviewed potential listing agents.

8.    Puerto Rico Property – Key in Properties.  Prior to this lawsuit Vision Online advanced funds to the (now) Receivership Entity Key In Properties, LLC, to enable it to purchase property located at Calle Julio Flores 96 A, Bo. Sardinera, Fajardo, PR (the "Fajardo Property).  The purchase price was $360,000, some of which was paid by the Alvarezes personally (with money that derived from Vision Online).  The Fajardo Property is operated as an AirBnB and generates gross annual revenues of approximately $65,000.  During the Third Interim Fee Period the Receiver analyzed the relevant real estate markets and interviewed potential listing agents.

9.    The Section 8 Properties -- Joint Venture through LGL.  Prior to this lawsuit the (now) Receivership Entity Oak Homes, LLC, became the 50 percent owner of a Michigan limited liability company called LGL Investments, LLC ("LGL"). The other 50 percent owner was a Florida limited liability company known as Smile Collection Rental, LLC.  Oak Homes is an affiliate of Vision Online, having common members and managers, but Smile Collection Rental is not an affiliate.  Oak Homes and Smile Collection Rental each provided funds to LGL to enable LGL to purchase a series of Section 8 housing units[13] located in Detroit.  The first group of seven homes were purchased in February 2023.  All the units required extensive

---

[13] Section 8 of the Housing Act of 1937 (42 U.S.C. §1437f), as repeatedly amended, authorizes the payment of rental housing assistance to private landlords on behalf of low-income households.

rehabilitation prior to being rented to tenants.  LGL purchased a second group of Section 8 properties, totaling another nine units, in June 2023, immediately prior to the initiation of this lawsuit.  For those nine properties, Oak Homes advanced all of the required funding to LGL.  These nine units require rehabilitation, which has not yet occurred, and as a result they presently are generating no revenues.

Because of the uncertainty associated with this lawsuit, Smile Collection Rental initially did not advance its share of the acquisition costs for the second group of properties, but during the Third Interim Fee Period the Receiver persuaded it to pay its share, totaling $257,941.82.  Thereafter, the Receiver and Smile Collection Rental's attorneys engaged in extensive negotiations concerning the properties.  Those negotiations, which included a significant amount of financial analysis by the Receiver, are ongoing.

 Additionally, the Receiver was faced with issues concerning the operations of the Section 8 Properties.  Specifically, the property manager did not pay the taxes on the properties, and it also did not inform LGL, Oak Homes or Smile Collection Rental about a series of building code violation notices that had been issued concerning the properties.  The Receiver discovered these issues and moved to address them.

10.    The Section 8 Properties – Vision Online and Ganadores IBR.  Prior to this lawsuit Vision Online and its affiliate, Ganadores IBR, each acquired two Section 8 housing units located in Detroit.  Vision Online advanced all of the money

to enable Ganadores IBR to purchase the two units acquired in its name.[14]  Vision Online then advanced funds as necessary to rehabilitate the four properties. These properties are rented and generating revenues.  LGL and Smile Collection Rental have no ownership interests in these four units, although the Receiver is discussing a possible sale of the units to Smile Collection Rental.

In addition to analyzing/listing/selling the various properties, the Receiver also undertook to ascertain their values during the Third Interim Fee Period.  This involved online research, much of which the Receiver delegated to the Deputy Receiver.

C.    Cozen O'Connor Fee Application.

The Alvarez Defendants, consisting of Richard Alvarez and Sara Alvarez, hired the Cozen O'Connor law firm to represent them in this litigation.  Cozen O'Connor also assumed the representation of Vision Online, Ganadores IBR, Vision Online Digital, Vision Online English, and Vision Online Latino (collectively the "Organizational Defendants") in the early part of the lawsuit.  The Receiver, then serving as the Monitor, advised the Cozen O'Connor firm that because of this litigation he believed the interests of the Alvarez Defendants were adverse to the interests of the Organizational Defendants, and that as a result Cozen O'Connor's representation of the two constituencies placed it in a position of conflict.

During the Second Interim Fee Period Cozen O'Connor requested that the Receiver pay it $175,749.20 for legal services it rendered to the Alvarez Defendants and the Organizational Defendants from the commencement of the litigation through July 18,

---

[14] The Receiver could not discover any reason that Vision Online and Ganadores IBR each decided to take ownership of two Section 8 housing units.

2023, the date on which the Court converted the monitorship into a receivership.  When the Receiver refused, Cozen O'Connor filed an application with the Court requesting payment of that amount.  The Receiver prepared and filed a written response in opposition to the fee application.  During the Third Interim Fee Period, Magistrate Judge Irick entered an *Order* (doc. no. 120) denying the motion without prejudice and requesting that the movant address certain specific issues if it chose to refile the motion.  Cozen O'Connor then filed a renewed motion requesting the same relief.  The Receiver began preparing a response and filed it after the conclusion of the Third Interim Fee Period.  The matter presently is under advisement.

D.    Robert Ferra, Daniel Segovia and Irving Moya.

During the Third Interim Fee Period the Receiver learned that former Vision Online employees Robert Ferra, Daniel Segovia and Irving Moya, were running a business that was similar to Vision Online's real estate coaching business.  The Receiver also learned that Ferra and Segovia had appropriated Vision Online's customer list and were soliciting those customers for their business.  Both Segovia and Moya had been associated with the Individual Defendant Robert Shemin, while Moya controlled a company that provided loans to customers who purchased the real estate coaching advice being offered by Ferra and Segovia.  The Receiver prepared and served records subpoenas on Moya and Ferra and their companies, following which they ceased operating their "copycat" business.

E.    Tax Issues

During the Third Interim Fee Period the Florida Department of Revenue contacted Vision Online with a threat to initiate collection actions because of Vision

Online's failure to pay state taxes.  The Receiver contacted Florida DOR and explained that under the Stipulated Preliminary Injunction all collection efforts against the Receivership Entities was stayed.

Additionally, during the Third Interim Fee Period the Receiver continued to analyze Vision Online's purported election, prior to this lawsuit, to be treated as a "C" corporation.  The IRS reported that it had no record of Vision Online making any election to become a "C" corporation.  The Receiver's investigation determined that, in fact, the Individual Defendant Richard Alvarez may not have properly completed the necessary paperwork to make a "C" election for Vision Online.  If this is the case, the effect will be that Vision Online's 2022 and 2023 tax returns, by which they paid approximately $1 million in federal corporate income tax, may need to be amended.  While there may be tax penalties associated with improperly filing as a "C" corporation, Vision Online also would be entitled to a refund of the taxes paid.

F.    Miscellaneous.

During the Third Interim Fee Period the Receiver was contacted by the United States Small Business Administration concerning an overdue SBA loan taken out by Vision Online.  The attorney for the SBA advised that under the Federal Priority Statute, 31 U.S.C. §3713, the SBA should be entitled to payment before all other creditors.  The Receiver demonstrated that (i) in receivership cases the highest priority goes to administrative expenses, *see SEC v. HKW Trading, LLC*, 2009 WL 2499146 (M.D. Fla.), and (ii) the Receiver can comply with the Federal Priority Statute by paying over funds collected to the FTC, which also is an agency of the United States of America.

During the Third Interim Fee Period the Receiver also engaged in various miscellaneous tasks, including preparing Vision Online staff for FTC interviews, contacting equipment lessors concerning their equipment to be picked up, negotiating an extension of the matured mortgage loan relating to the West Palm Beach property, and updating Vision Online's social media sites.

III.   STANDARD FOR AWARDING COMPENSATION

The Supreme Court has noted:

> Nor is there any doubt of the power of courts of equity to fix the compensation of their own receivers.  That power results necessarily from the relation which the receiver sustains to the court; and, in the absence of any legislation regulating the receiver's salary or compensation, the matter is left entirely to the determination of the court from which [the receiver] derives his appointment.   The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted to [the receiver], and the perplexity and difficulty involved in that management.

*Stuart v. Boulware*, 133 U.S. 78, 81-82 (1890).  To determine reasonable compensation for a receiver, a court should employ the familiar lodestar approach by calculating a reasonable hourly rate in the relevant market and a reasonable number of hours expended.  *S.E.C. v. Aquacell Batteries, Inc.*, 2008 WL 276026 (M.D. Fla. 2008).  This figure then should be adjusted by examining the following factors:  (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the

professional relationship with the client; and (12) awards in similar cases.  *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).[15]

       A.     The Time and Labor Required.  The time and labor required are reflected in the attached Exhibit "A."  In this case the activities performed during the Third Interim Fee Period required a significant amount of the Receiver's time and attention.  As discussed above, the Receiver expended a total of 250.7 hours in connection with the services he rendered during the Third Interim Fee Period.  The Receiver generally recorded only approximately 90 percent of his actual time to try to provide efficiencies to this case.  Additionally, the Receiver did not record an estimated 20 or more hours of time spent traveling between Tampa and Orlando on four occasions.

       B.     The Novelty and Difficulty of the Question.  Investigating the business practices of the Receivership Entities required the Receiver to draw upon all of his judgment, expertise and substantive legal and business knowledge, including specialized knowledge in the real estate and construction industries.  In particular, the Receiver spent considerable effort understanding regulations that implemented Section 8 of the Federal Housing Act of 1937.  The Receiver also spent efforts understanding and implementing tax regulations governing Qualified Settlement Funds (*see* 26 C.F.R. Part 1.468B-1).  The Receiver notes that he is not fluent in Spanish, which made it somewhat more difficult for him to process videos and documents.[16]

---

[15] Decisions from the former Fifth Circuit Court of Appeals entered prior to September 30, 1981, are binding precedent in the Eleventh Circuit.  *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981).

[16] Vision Online employees Ivan Reybel, Carmen Gonzalez and Von Marie Cardoso were patient and helpful in assisting the Receiver in this regard.

C.    The Skill Necessary to Perform the Services Properly.    Again, analyzing, evaluating and shutting down the Defendants' real estate coaching business, attempting to unravel hundreds of transfers of funds between the Defendants and third parties, and determining appropriate valuations for properties that the Receiver listed for sale, and then sold, presented unique challenges.

D.    The Preclusion of Other Employment.    During the Third Interim Fee Period the Receiver devoted a significant amount of his time to this matter, and as a result he was unable to work on other matters in which his clients had agreed to pay higher hourly rates than the $395 requested herein.  The Receiver also notes that his recorded time does not include an estimate 20 hours, or more, of time he spent traveling (on I-4) between Tampa and Orlando.

E.    The Customary Fee.    The fees requested by the Receiver are those that are charged for similar services, except that, in this case the Receiver discounted his 2023 standard hourly rate by $465.00 per hour.  The Receiver also generally recorded only 90 percent of the time he spent working on matters.  The Receiver submits that, as an attorney, he has been able to provide the receivership estate with certain efficiencies that a non-attorney Receiver would not be able to provide; in particular, the Receiver has handled many if not most of the legal issues that have arisen (at his discounted hourly rate) himself.

Regarding the appropriate hourly rate, the Court is familiar with the local market and can determine an appropriate rate without further evidence.  *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988) (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).   The Receiver notes that

in the materials presented to the Court in support of the Plaintiff's motion to appoint the Receiver, the Plaintiff accurately represented that the Receiver had agreed to accept the hourly rate of $395.00.  The Court has previously determined in this case that $395.00 is a reasonable hourly rate for the Receiver.

       F.    <u>Whether the Fee is Fixed or Contingent</u>.  The fees requested are not contingent; however, they are subject to this Court's approval prior to being paid.

       G.    <u>Time Limitations Imposed by the Client</u>.  No extraordinary consideration need be given to this factor.

       H.    <u>The Amount Involved and the Results Obtained</u>.  The Receiver recovered more than $2.5 million cash, as well as properties that the Receiver preliminarily estimates could be worth another $3 million or more (net of third-party mortgages and sale costs).  The funds recovered will be used to fund the receivership estates, and for consumer redress, assuming that the Plaintiff obtains a final judgment.

       I.    <u>The Experience, Reputation and Ability of the Receiver</u>.  The Receiver is a 1986 graduate of the Notre Dame Law School, where he was a member of the Notre Dame Law Review.  The Receiver holds an AV rating from Martindale Hubbell as an attorney.  The Receiver has been recognized as Lawyer of the Year by Best Lawyers in America for the Tampa Bay region for two of the past three years.  Over the past 20+ years the Receiver has served as a receiver for well over 180 entities in more than 20 receivership appointments in cases involving allegations of fraudulent misconduct and unlawful business practices, such as are involved this case, from courts located in Florida, Georgia and Illinois.

J.     The "Undesirability" of the Case.  The case involved a very significant time commitment, but otherwise this factor need be given no extraordinary consideration.

K.     The Nature and Length of the Professional Relationship.  The Receiver reports to the Court, and accordingly there is no "professional relationship" within the usual meaning of the phrase.  However, as noted above, for more than 20 years the Receiver regularly has been appointed as receiver by this and other courts for companies allegedly involved in fraudulent conduct.

L.     Awards in Similar Cases.  It is customary for a court to award a receiver the fees requested, particularly where the receiver has performed as directed and has requested a reasonable amount.

IV.    EXPENSES

During the Second Interim Fee Period the Receiver incurred reimbursable expenses totaling $463.71.  These are itemized on the attached Exhibit "A."  They include charges for Federal Express deliveries, and mileage reimbursements (utilizing the 2023 and 2024 IRS-approved reimbursement rate).

V.     CONCLUSION

As set forth above, during the Third Interim Fee Period the Receiver recorded 250.7 hours of billable time.  At the agreed hourly rate of $395.00, this would result in fees of $99,026.50.  Additionally, during the Third Interim Fee Period the Receiver incurred reimbursable expenses of $463.71.  No parties have advised of any substantive objections to the Receiver's fee application, and the Receiver accordingly requests entry of an order approving the application.

<u>LOCAL RULE 3.01(g) CERTIFICATION</u>

The Receiver certifies that prior to filing this motion he made a reasonable effort to confer with all parties who may be affected by the relief requested herein.  All counsel (and the Defendant Chamberlain, who is unrepresented) advised that they do not object to the relief requested herein.  The matter therefore is not contested by any of the parties.

<u>VERIFICATION</u>

The Receiver certifies that all factual statements contained herein are true and correct.

Dated:        Tampa, Florida
              August 26, 2024

                         /s/ Mark J. Bernet_____
                         Mark J. Bernet, Receiver
                         401 E. Jackson Street, Suite 1700
                         Tampa, Florida 33602
                         Telephone:  (813) 223-7333
                         Facsimile:  (813) 218-5495
                         Email:  mark.bernet@akerman.com
                         Secondary:  caren.deruiter@akerman.com

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served by CM/ECF and via e-mail to J. Ronald Brooke, Esquire, e-mail jbrooke@ftc.gov; Virginia Rosa, Esquire, e-mail vrosa@ftc.gov; Arielle S. Eisenberg, email: aeisenberg@cozen.com; Nicole H. Sprinzen, email: nsprinzen@cozen.com; Meghan E. Stoppel, email: mstoppel@cozen.com; Craig M. Hansen, email: hansen@mvmlegal.com; Jason A. McNeill, email: mcneill@mvmlegal.com; Erick K. Schnibbe, email: schnibbe@vmvlegal.com; Sara L. Kallop, email: skallop@rumberger.com; Lan B. Kennedy-Davis, email: lkennedy@rumberger.com; and Bryce Chamberlain, email chamberlainbryce@gmail.com, this 26th day of August, 2024.


*/s/ Mark J. Bernet* _____
Mark J. Bernet, Receiver

77773609;1