### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

     Plaintiff,

     v.

VISION ONLINE, INC., a Florida corporation,
et al.

     Defendants.

Case No. 6:23-cv-1041-WWB-DCI

**RENEWED JOINT MOTION[1]  FOR ENTRY OF PROPOSED STIPULATED ORDERS FOR PERMANENT INJUNCTION AND MONETARY JUDGMENT AS TO THE CORPORATE DEFENDANTS, ALVAREZ DEFENDANTS AND DEFENDANT CHAMBERLAIN**

Plaintiff Federal Trade Commission ("FTC") and Defendants Richard Alvarez, and Sara Alvarez ("Alvarez Defendants") respectfully submit this Renewed Joint Motion for Entry of Stipulated Order for Permanent Injunction and Monetary Judgment as to Vision Online, Inc., Ganadores IBR, Inc., Vision Online Digital, LLC, Vision Online English, LLC, Vision Online Latino, LLC, ("Corporate Defendants") and the Alvarez Defendants ("Corporate/Alvarez Stipulated Order") and Defendant Chamberlain ("Chamberlain Stipulated Order") (collectively "Stipulated Orders").  If entered by the Court, the Stipulated Orders will resolve all allegations in this matter as to the individual Settling Defendants and the Corporate Defendants.[2]

---

[1] As noted in both Stipulated Orders, the Corporate and Alvarez Defendants and Defendant Chamberlain (collectively, "Settling Defendants") neither admit nor deny the allegations in the FTC's Complaint, except as otherwise agreed to in the Stipulated Orders.  Similarly, the Settling Defendants neither join in nor oppose the allegations as to them in this Motion, but join in or do not oppose the requested relief.

[2] Except for the pending Renewed Motion for Payment of Attorneys' Fees and Costs of Corporate Defendants, and Richard and Sara Alvarez (ECF 125).

## I.  BACKGROUND

On June 5, 2023, the FTC filed *ex parte* its Complaint for Permanent Injunction, Monetary Relief, and Other Relief (ECF 1) pursuant to Sections 13(b) and 19 of the FTC Act, the Business Opportunity Rule, the Cooling-Off Rule, and the Consumer Review Fairness Act ("CRFA") against the Settling Defendants and Defendant Robert Shemin (collectively "Defendants"), and moved pursuant to Fed. R. Civ. P. 65(b) for a temporary restraining order ("TRO") including an asset freeze against the Defendants (ECF 4).

The Complaint alleges that Defendants participated in deceptive and unfair acts and practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, the Business Opportunity Rule, the Cooling-Off Rule, and the CRFA in the advertising, marketing, and selling of workshops, mentoring, and business opportunities to consumers through Ganadores Online and Ganadores Inversiones Bienes Raíces ("collectively "Ganadores").   The Complaint seeks permanent injunctive and equitable relief, including monetary relief to redress injured consumers (ECF 1 at 64).

On June 7, the Court entered a TRO[3] that enjoined further law violations, froze the Individual Defendants' assets, and placed a monitor over the Corporate Defendants to preserve the possibility of granting "effective final relief for consumers—including monetary restitution, rescission, or refunds…".   (ECF 11).[4]

---

[3] Among other things, the Court found that, "[t]here is good cause to believe that Defendants have engaged in and are likely to engage in acts or practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), the Business Opportunity Rule, the Cooling-Off Rule, and the CRFA and that the FTC is therefore likely to prevail on the merits of this action." (ECF 11 at 3).

[4] The TRO named Mark Bernet as a temporary monitor over the Corporate Defendants and provided a mechanism for the monitor to trace the flow of consumer money into non-

Section II.I of the TRO defined "Monitored Entities" to include, in addition to the Corporate Defendants, any other entity that had received "assets derived from any activity that is the subject of the Complaint in this matter, and that the Monitor determines is controlled or owned by any Defendant." *Id.* at 6.

On July 18, 2023, the Court entered a consolidated Stipulated Preliminary Injunction against the Settling Defendants (ECF 52) ("Stipulated PI"). The Stipulated PI continued the freeze of the individual Settling Defendants' assets (releasing some funds for living expenses and legal fees) and converted the Corporate Defendants into receivership entities, freezing their assets, and putting them under the control of a receiver.[5]

On August 4, 2023, the receiver filed his Initial Report (ECF 62). After reviewing the Corporate Defendants' records and interviewing employees, the receiver determined that Vision Online, Inc. ("Vision Online") had made unsubstantiated earnings claims to entice consumers to purchase its business opportunities, and that Vision Online could not be operated lawfully and profitably. The Alvarez Defendants filed their objections to the

---

party entities controlled by a defendant and to notify these entities that they were part of the monitorship, subject to the right to challenge his determination with the Court. *See*, ECF 11, Sec. XIII.J ("Upon determining that a nonparty entity is a Monitored Entity, the Monitor shall promptly notify the entity as well as the parties, and shall inform the entity that it can challenge the Monitor's determination by filing a motion with the Court."). On June 15, 2023, the monitor advised the Court that he had added five non-party companies to the monitorship because they fit the TRO's definition of "Monitored Entities." (ECF 16). None of the entities or parties challenged the determination.

[5] After the entry of Stipulated PI, the receiver gave notice that he was extending the receivership over the same five non-party companies discussed in footnote 2, above (ECF 58). None of the entities or parties challenged the receiver's decision.

receiver's Initial Report (ECF 70) on August 16, 2023, including an objection to the scope of the receiver's report.

On January 17, 2024, the FTC and the Settling Defendants filed a Joint Application for Entry of Stipulated Orders for Permanent Injunction and Monetary Judgment as to the Settling Defendants (ECF 114),[6] which was denied without prejudice by Magistrate Judge Irick on March 6, 2024 (ECF 119).   On March 13, the FTC and the Corporate and Alvarez Defendants, and the FTC and Chamberlain, filed separate motions for entry of stipulated final orders for permanent injunction and monetary judgment as to Chamberlain and the Corporate and Alvarez Defendants. (ECFs 121 and 122 collectively, "March Motions").

On July 19, the FTC and Defendant Chamberlain filed a motion seeking expedited consideration of their proposed settlement due to Chamberlain's serious health-related issues (ECF 153).   On August 2, the Court denied the March Motions (ECF 155), holding that they had failed to provide "sufficient argument or evidence to justify the requested relief under either § 53(b) or § 57b."   ECF 155 at 2.   "Specifically, there is no explanation linking the monetary relief to claims properly redressed by § 57b or otherwise stating why that section authorizes the requested relief."   *Id*.

---

[6] The CEO of the Corporate Defendants, Richard Alvarez, signed the Stipulated Orders on October 31, 2023. The Receiver over the Corporate Defendants, Mark Bernet, signed the Stipulated Orders on January 12, 2024. The Receiver entered his appearance as counsel on behalf of the Corporate Defendants on April 24, 2024 (ECF 140). The Court approved the withdrawal of Nicole Sprinzen, Meghan Stoppel, and Arielle Eisenberg, and the firm of Cozen O'Connor, as counsel for the Corporate Defendants on May 13, 2024 (ECF 148).   While the Receiver does not formally join this Motion on behalf of the Corporate Defendants, he advises that he does not oppose the relief proposed in the Corporate Defendant / Alvarez Stipulated Order.

The Court held that the FTC failed to provide "proper proof that the Settling Defendants are likely to engage in further violations or that this is a proper cause in which to issue permanent injunctive relief."   *Id*.   And further held that the March Motions failed to provide "the legal authority under which the Court" could grant "relief against the Settling Defendants' agents, employees, and all other persons in active concert or participation with them," and appoint "a receiver to liquidate the assets of the receivership entities, many of whom are not parties to this litigation."   *Id*.

In addition, the Court directed the FTC to show cause why the claims against the Settling Defendants should not be dismissed with prejudice pursuant to Local Rule 3.09(b).   *See id*. at 3.   The FTC filed its Response on August 9 (ECF 156), and on August 12 the Court discharged the Order to Show Cause and ordered that "[a]ny renewed motions for judgment or permanent injunctive relief as to the Settling Defendants shall be filed on or before August 26, 2024." (ECF 157).

## II.  ARGUMENT AND EVIDENCE IN SUPPORT OF THE REQUESTED RELIEF

The FTC provides below the support that the Court identified in the August 2 Order (ECF 155) as required to approve the requested relief in the Stipulated Orders.

### A. Section 19 Of the FTC Act Authorizes the Requested Monetary Relief

The Stipulated Orders impose a monetary judgment, for which the Settling Defendants are jointly and severally liable, to be used for consumer redress.[7]   As explained below, the Court is authorized to approve the stipulated judgment pursuant to the rules and CRFA violations alleged in the Complaint and Section 19 of the FTC Act.

Section 19(a) allows the FTC to commence a civil action in federal court against "any person, partnership, or corporation" that "violates any rule under this subchapter respecting unfair or deceptive acts or practices … for relief under subsection (b)." 15 U.S.C. § 57b(a); *see also FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1328 (11th Cir. 2023).   Section 19(a)'s reference to "any rule under this subchapter respecting unfair or deceptive acts or practices" relates to Section 18 of the FTC Act, 15 U.S.C. § 57a, the authority that allows the FTC to issue rules with respect to unfair or deceptive acts or practices under the FTC Act.

The Complaint alleges that, in advertising, marketing, and selling the Ganadores workshops, mentoring, and business opportunities, Defendants engaged in widespread unfair or deceptive acts or practices in violation of the Business Opportunity Rule and the Cooling Off Rule.   Specifically, the following sections of the Business Opportunity Rule and Cooling Off Rule:

| Rule | Section | Complaint Count |
|------|---------|-----------------|

---

[7] Sections VIII-IX of both Stipulated Orders.   The Settling Defendants have represented to the FTC, through documents and sworn testimony, that they do not have assets sufficient to pay the full judgment amount.   Thus, the balance of the judgment would be suspended after the Settling Defendants transfer to the FTC or the receiver the assets they have agreed to relinquish under the Stipulated Orders.

| Business Opportunity | 16 C.F.R. § 437.6(d) | Count VII |
| | 16 C.F.R. § 437.4(a) | Count VIII |
| | 16 C.F.R. § 437.4(c) | Count IX |
| | 16 C.F.R. §§ 437.2, 437.3(a), 437.4 | Count X |
| Cooling Off Rule | 16 C.F.R. § 429.1 | Count XI |

The Complaint also alleges that Defendants engaged in unfair or deceptive acts or practices in violation of the CRFA (Count XII).  Pursuant to 15 U.S.C. § 45b(d)(1), a violation of the CRFA "shall be treated as a violation of a rule" the Commission issued pursuant to Section 18.

Section 19(b) of the FTC Act allows the FTC to seek, and the Court to grant, monetary relief, including consumer redress, for rule violations, such as those discussed above. 15 U.S.C. § 57b(b).[8]  The Court is authorized to grant "such relief as [it] finds necessary to redress injury to consumers," which "may include … rescission or reformation of contracts [and] refund of money."[9]  *Id*.

The FTC alleges that Defendants' scheme was permeated with deception and used false and unsubstantiated earnings claims and that those claims were material in

---

[8] *See*, *e.g.*, *FTC v. Simple Health Plans LLC*, 58 F.4th 1322, 1328 (11th Cir. 2023) ("Section 13(b) … allows for prospective injunctive relief … Section 19, on the other hand, allows for relief 'necessary to redress injury to consumers.'"); *FTC v. Romero*, 2022 WL 4095424, at *4 (M.D. Fla., June 29, 2022); *FTC v. Capital Choice Consumer Credit*, 2004 U.S. Dist. LEXIS 32306, at *117 (S.D. Fla., Feb. 20, 2004) ("Section 19(b) … provides restitutionary relief for violations of FTC Rules."); *FTC v. Southwest Sunsites, Inc.*, 665 F.2d 711, 719–20 (5th Cir. 1982) ("final, complete relief in this case may entail consumer redress through a Section 19 proceeding").

[9] To obtain consumer redress, the FTC must show consumer injury, but is not required to show reliance by each individual consumer on the deceptive claims made by defendants.  *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000).

convincing consumers to purchase Defendants' business opportunities.[10]   These allegations are supported by complaints from numerous consumers and undercover shops conducted by FTC staff.[11]   Moreover, the receiver, after reviewing the Corporate Defendants' records and interviewing their employees, determined that Vision Online had

---

[10] *See, e.g.*, ECF 1 ¶¶ 55, 66, 156–157 (Deceptive and Untrue Testimonials and Reviews); Count I False or Unsubstantiated Earnings Claims, ¶¶ 161–163; Count II Misrepresentations Regarding Ganadores Workshops, ¶¶ 164–167; Count III Misrepresentations Regarding Ganadores Mentoring Packages and Other Services, ¶¶ 170; Count IV Misrepresentations Regarding Defendants' Need for Consumers' Financial Information, ¶¶ 171–174; Count V Deceptive Reviews and Testimonials, ¶¶ 175–177; Count VII Misrepresentations Regarding Income or Profits, ¶¶ 190–191.

[11] *See, e.g.,* PX 1 Declaration of Luis Aldana attached to Plaintiffs' Emergency Ex Parte Motion for Temporary Restraining Order with Asset Freeze, Appointment of Temporary Monitor, Other Equitable Relief, and Order to Show Cause Why A Preliminary Injunction Should Not Issue, and Memorandum in Support Thereof, ECF 4 ("TRO Memo") ("Aldana"), ¶ 45 ("Emanuel told me I could make $80,000 on my first flip.   He said I could make all of the money I invested in buying the Ganadores IBR package back in a single deal."); PX 2 Declaration of Edgar Barajas attached to TRO Memo ("Barajas"), ¶ 7 ("At least one Ganadores representative told me that, if I purchased the VIP package, I would make back my entire investment on my first deal."); PX 3A Declaration of Martha Covarrubias attached to TRO Memo ("Covarrubias") ¶ 39 ("Most importantly, Alma told me not to worry about the cost of the VIP package. Alma said that with our first deal my husband and I would be able to recoup our investment."); PX 13A Declaration of Susana Sanchez attached to TRO Memo ("S. Sanchez") ¶¶ 13-18, 70 (S. Sanchez) ("Ganadores told me and the other attendees that we would easily earn back the cost of their mentoring packages within six months with the income from our Amazon stores. But that was not true.); ECF 135-1, Declaration of Adalberto Mariscal, attached to Plaintiff's Amended Response and Objection to Renewed Motion for Payment of Attorneys' Fees and Costs of Corporate Defendants and Richard and Sara Alvarez (ECF 135) ("Amended Response to Renewed Fee Motion") ("Mariscal"), ¶ 20 ("Richard Alvarez came up to me and told me not to worry, that in two months I was going to recoup my investment."); ECF 135-5, Declaration of Jennifer Gadea, attached to Amended Response to Renewed Fee Motion ("Gadea"), ¶ 21 ("[Mr. Alvarez] explained that those who purchased the $10,000 package would recover the cost in just three months of doing Amazon sales."); PX 139, Declaration of FTC Investigator Luis Solares attached to TRO Memo ("Solares"), ¶¶ 11, 12, 13, 30, 31, 35, 38; PX 140, Declaration of FTC Investigator Diana Shiller attached to TRO Memo ("Shiller I"), ¶¶ 214, 215, 261, 263, 264.

made unsubstantiated earnings claims, and that the company could not be operated lawfully and profitably (ECF 62 at 3).

Under similar circumstances, numerous courts have held that an appropriate measure of consumer redress is defendants' net revenue or gross income—*i.e.*, gross sales minus refunds and chargebacks. *See, e.g., United States v. MyLife.Com, Inc*., 567 F. Supp. 3d 1152, 1161 (C.D. Cal. 2021); *FTC v. QYK Brands LLC*, 2022 U.S. Dist. LEXIS 67380, at *21 (C.D. Cal. April 6, 2022); *FTC v. Nat'l Urological Group,* 645 F. Supp. 2d 1167, 1212 (N.D. Ga. 2008).

Section 19 includes a three-year statute of limitation. 15 U.S. Code § 57b(d). Thus, the judgment in the Stipulated Orders represents the total gross income (total sales minus refunds and chargebacks) generated by Defendant Vision Online for 2021-2023. The judgment amount, $29,175,000, is based on the Corporate Defendants' records and was calculated by adding Vision Online's gross income figures for 2021-2023, as presented in the receiver's August 4, 2023 report (ECF 62 at 13, income table) (See also, Declaration of FTC Investigator Diana Shiller attached hereto as Attachment A ("Shiller II) at ¶ 8).

### B. Proof That Supports the Requested Injunctive Relief

Section 13(b) of the FTC Act provides that, "in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction." 15 U.S.C. § 53(b).  The test of whether a permanent injunction is appropriate "is whether 'the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future.'" *FTC v. Lalonde*, 545 F. App'x 825, 841 (11th Cir. 2013) (quoting *CFTC v. Wilshire Inv. Mgmt. Corp.*, 531 F.3d 1339, 1346–47 (11th Cir. 2008)).

To assess the likelihood of future misconduct, courts consider "the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's assurances against future violations, the defendant's recognition of the wrongful nature of his conduct, and the likelihood that the defendant's occupation will present opportunities for future violations." *FTC v. RCA Credit Servs., LLC*, 727 F. Supp. 2d 1320, 1335 (M.D. Fla. 2010) (*quoting SEC v. Carriba Air, Inc.*, 681 F.2d 1318, 1322 (11th Cir. 1982)). *See also FTC v. Higher Goals Mktg. LLC*, 2019 U.S. Dist. LEXIS 206314, at *21 (M.D. Fla. Nov. 6, 2019).

In the instant matter, the FTC has reason to believe that absent the injunctive relief proposed in the Stipulated Orders, there is a reasonable likelihood of future violations by the Settling Defendants for the following reasons. First, the FTC believes that the Settling Defendants' conduct was egregious. The receiver has reported that the Settling Defendants directed their conduct toward Spanish-speaking consumers with ads representing that they will reveal the secrets to generating "substantial income."[12] The FTC's believes that the evidence in the record demonstrates that Settling Defendants' representations were deceptive and lacked substantiation.[13] As a result, numerous consumers paid tens of thousands of dollars to Ganadores, burdening many of them with debt.[14]

---

[12] Monitor's / Receiver's Initial Report ("Receiver's Report") (ECF 62, p. 12, 13, 24).

[13] *Id.* at pp. 26, n. 21, 29.

[14] *See, e.g.,* PX 6 Declaration of Gabriel Garcia attached to TRO Memo ("Garcia") ¶ 93 ("My wife and I lost our retirement savings, are maxed out on our credit cards, and were not able to close a single real estate deal, even though we did everything Ganadores IBR told us to do."); PX 7A Declaration of John Hurtado attached to TRO Memo ("Hurtado") ¶ 91 ("Purchasing the Ganadores' VIP package was the worst financial decision of my life.

Second, the violations alleged in the Complaint were not isolated events.   Rather,

as the FTC has alleged, Defendants' conduct occurred across the country for several

years.   The FTC believes the evidence it has obtained so far demonstrates that

Defendants Richard Alvarez and Bryce Chamberlain made deceptive claims discussing

the wealth or financial freedom they represented they had obtained through real estate

investing or eCommerce,[15] and to date, the receiver has been unable to locate any

---

The credit card debt that my wife and I have because of Ganadores has us on the edge
of a financial crisis."); PX 13A S. Sanchez ¶ 76 ("[P]urchasing the Ganadores' mentoring
package left me with tens of thousands of dollars in debt."); PX 14 Declaration of Ashley
Sica attached to TRO Memo ("Sica") ¶ 88 ("During these six months of enrollment in
Ganadores, we did not make any money or close any deals. Instead, we lost $12,997 and
spent hours attending unhelpful webinars and trying to contact Ganadores. This was a
huge loss for us, as we had used our house down payment money to cover the program
tuition. Now Jose and I are stuck having to pay back this loan. We have been having a
very tough financial year because of this."); ECF 135-4 Declaration of Yady Bedoya,
attached to Amended Response to Renewed Fee Motion ("Bedoya") ¶ 29 ("We have
personal debts that we did not have before joining Ganadores. I have lost approximately
$25,000.").

[15]   PX 7A Declaration of Angel Diaz attached to TRO Memo ("Diaz") ¶19 ("Alvarez
introduced Bryce since Bryce did not really speak Spanish. Alvarez told the audience
that Bryce owned several properties in Utah and that the wealth generated from these
properties had enabled Bryce to get his children set up for life."); Diaz ¶24 ("During the
second and third days of the seminar, Alvarez and Shemin spoke together at times with
so much enthusiasm and charm that greatly energized people, especially me. While
neither of them ever explicitly stated they were millionaires, it was easy for students to
make that assumption based on the number of properties the two had purchased and
sold. They both repeatedly referred to the Ganadores "system," and claimed that
students would make a lot of money if they followed this "system." They stated that
anyone could do this type of business.") Diaz ¶25 ("Alvarez and Shemin also shared
stories about purchasing and renting plots of land and then building from scratch.
Alvarez explained that one way he put the plots of land to use was by setting up
billboards on them. Companies would then pay him up to $5,000 a month to place their
advertisements on one of the billboards. Alvarez spoke about this strategy in a way that
made it seem simple, as if it were something that all the students could attempt to do
and make a profit easily."); PX 6 ¶ 13 Garcia ("Mr. Alvarez and other Ganadores IBR
presenters spent much of the first day of the Three-Day Workshop talking about how
much money they had made in the real estate business, and how Ganadores IBR had
helped them get into real estate and had let them stop working for other people and

become their own bosses."); PX 7A ¶ 21 Hurtado ("Mr. Alvarez talked about real estate as a very profitable business that could make a lot of money. He provided many examples of real estate deals with which he had made substantial benefits, such as $50,000 or $100,000 per house."); PX 11 ¶ 14 Declaration of Roberto Perez attached to TRO Memo ("Perez") ("Bryce Chamberlain told us that he was so successful in real estate investing that his daughter and son-in-law, who both had graduate degrees, were changing professions to follow him in the real estate investing business."); PX 13 ¶ 15 S. Sanchez ("A man spoke in a video that the Ganadores representatives showed at the workshop. I believe he said his name was Richard Alvarez. He said he was originally from Cuba, and now he was the owner of Ganadores Online. He said he had used the money he made from Amazon to buy and sell real estate. He said that he had founded Ganadores to give back to the Latino community and to help other Latinos achieve financial freedom.") PX 14 ¶ 28 Sica ("Alvarez, who introduced himself as the CEO of Ganadores, explained to the group why he had founded Ganadores. He said that when he had first gotten into real estate investing, he noticed that there were not a lot of other Latinos in the field. He had acknowledged that this was likely due to there being a language barrier for Latinos and Spanish speakers who wanted to break into the field. Alvarez really wanted to give back to and help fellow Latinos achieve the same level of success as him in real estate investing, which led him to start the company."); PX 14 ¶ 35 Sica ("Alvarez went on to explain that he owned some container homes in Puerto Rico that he was currently renting out as Airbnbs. He pulled these up on the screen for everyone to see. He explained that these container home Airbnbs, which were essentially vacation homes, had been extremely successful for him…"); PX 139 ¶ 13 Solares ("Eusebio Graterol said that Richard Alvarez and an investor (like us), earned $2.655 million in a nine month deal."); PX 140 ¶¶ 69 Shiller I ("On June 1, 2023, I searched Google for "ganadores inversiones bienes raíces" and below the GIBR's website link it stated "Aprende a Invertir Real Estate con el Sistema infallible de Richard Alvarez y Ganadores Inversiones Bienes Raices. ["Learn to invest in real estate with the infallible system of Richard Alvarez and Ganadores Inversiones Bienes Raices."]."); Shiller II at ¶¶ 32(d) ("Esta casa, en Airbnb, el día que yo la compré se rentaba por 189. Anoten el número, 189 diarios. ¿OK? 189 diarios."   [This house, on Airbnb, the day I bought it, was rented for 189. Write down the number, 189 a day. OK? 189 daily]); ¶ 32(f) ("So, Airbnb, en cualquier parte del mundo, es lo mejor que está sucediendo hoy por hoy.   Este Airbnb, hoy, estoy empezando a "bookear" octubre está full y no para." [So, Airbnb, anywhere in the world, is the best thing happening today.   This Airbnb, today, I'm starting to "book" October - it's full and doesn't stop.]); ¶ 32(g) ("[T]engo nueve proyectos en Puerto Rico corriendo hoy. Nueve. Estoy comprando cinco terrenos más, estoy haciendo Airbnbs left and right. Yo hago Airbnbs, los pongo en la corporación, los pongo a hacer plata y vendo el negocio. No vendo el real estate, vendo el negocio. Todos los activos dentro del negocio. So si yo tengo 400.000 dólares en un proyecto. Y esos 400,000 dólares dan 12,000 al mes…Esa no es no propiedad eso es un negocio, Y ese negoció deja 12,000 al mes…y ese negoció vale $1,0000,000: [I have nine projects in Puerto Rico running today. Nine. I'm buying five more pieces of land, I'm doing Airbnbs left and right. I make Airbnbs, I put them in the corporation, I put

12

evidence that Defendants Richard Alvarez and Bryce Chamberlain "personally generated any substantial revenues by investing in real estate."[16]   Moreover, before starting Ganadores, certain Settling Defendants were employed by companies that engaged in similar conduct promoting business opportunities and real estate coaching services, FBA Stores and Zurixx.[17]   The FTC subsequently brought enforcement actions against both companies. The FTC alleges that the evidence shows that Ganadores was a Spanish-language version of the same programs offered by FBA Stores and Zurixx.[18]   Richard Alvarez worked for FBA Stores and was a sales presenter for Zurixx,[19] and Chamberlain worked for Zurixx until it was shuttered.[20]   The FTC believes these connections demonstrate that the skills used by presenters in the workshop sales environment are easily transferable, creating a likelihood of future violations.[21]

---

them to make mone, and I sell the business. I'm not selling the real estate, I'm selling the business. All the assets within the business. So if I have 400,000 dollars in a project. And those 400,000 dollars give 12,000 a month... That is not a property, that is a business, and that business leaves 12,000 a month... and that business is worth $1,0000,000]").

[16] Receiver's Report (ECF 62 at 30).  Indeed, the FTC has received complaints from more than 500 Ganadores purchasers, most of whom stated that they did not make any money). *See* Declaration of FTC Investigator Blanca Graham Cordova, attached hereto as Attachment B, ¶ 7.

[17] PX 140 Shiller I ¶¶ 185 and 195 (noting payments to Richard Alvarez by FBA Stores and Zurixx) and PX 140 Shiller I, ¶ Attachment O (FTC-VO-0311) (Chamberlain Linked In noting job at Zurixx).

[18] Compare PX 140 Shiller I ¶¶ 196, 197, 198, 204, and 263 (Zurixx use of "Investment Cards," Shemin making same $100,000 income claim at Zurixx events (¶¶ 197, 198), Chamberlain using almost verbatim language at Zurixx event (¶ 196) and Ganadores event (¶ 263)).

[19] Complaint (ECF 1), ¶¶ 7, 63.

[20] PX 140 Shiller I, ¶¶ 200-203.

[21] For example, at least four Ganadores employees were closers at Ganadores workshops for both ecommerce and real estate investing. Shiller II, at ¶ 60 (noting that Eusebio Graterol, Tatiana Bello, and Esther Arañaz were sales consultants for the

Third, the FTC believes these prior connections to FBA Stores and Zurixx show that Defendant Richard Alvarez and Defendant Bryce Chamberlain knew that deceptive earnings claims were prohibited by law, and thus acted with a high degree of scienter in this matter.[22]   Moreover, Sara Alvarez regularly worked at Ganadores sales events and had an office at Vision Online's business premise.[23]   Mrs. Alvarez was well aware of the representations made by her husband at Ganadores sales events that the FTC alleges were deceptive.[24] In combination with the FTC's Complaint and Motion for a TRO (ECF

---

ecommerce and real estate workshops based on the Corporate Defendants' internal records) and ¶¶ 61-62 (noting that Alma Dubón was included on emails to the Ganadores ecommerce sales team). *See also* PX 12A R. Sanchez, ¶ 25 ("Alma told us she…had started as a member of Ganadores. She said she had sold houses and was now a successful real estate investor. For example, she mentioned that she was the owner of some apartments that she would soon sell for a profit.")

[22] Receiver's Report ECF 62 at 25: While Vision Online had a policy prohibiting closers from making misrepresentations, the policy did not appear to be enforced.

[23] PX 139 Solares, ¶ 24 ("There were five GIBR representatives there when I arrived. Four of them were introduced to the attendees as Bryce Chamberlain, Alma Dubon, Gustavo Acosta, and Yolanda Miller. Additionally, there was a woman who was identified as Richard Alvarez's wife. I was not told her name.") and ¶ 28 ("Around 9:30 AM, Richard Alvarez said that the lady at the front helping was his wife. He asked the audience how many of you would like to work with your family?"); PX3A Covarrubias, attached to TRO Memo, ¶ 21 ("Mr. Alvarez's wife, Sara Alvarez, was in the back of the room during the workshop. She took payments from attendees."); Declaration of FTC Investigator Diana Shiller attached to Amended Response to Renewed Fee Motion (ECF 135-6) ¶ 37 ("On June 8, 2023, I took the following photographs of an office at 733 W. Colonial Dr. Orlando, Florida, which appeared to be Sara Alvarez's office based on photographs of Sara and Richard and documents located in the office."), ¶ 37(c) (showing mail addressed to Sara Alvarez at Vision Online's business address) and ¶ 37(d) (showing a picture of a sign stating "Boss Lady"); Shiller II at ¶¶ 47-51 (summarizing recordings indicating that Sara Alvarez co-directed sales with Bryce Chamberlain for at least one three-day Ganadores seminar.).   *See also* PX 138 Declaration of Roshni Agarwal, attached to the TRO Memo ¶ 7(c), (e), and (f) (noting Sara Alvarez was a signatory for three Vision Online bank accounts).

[24] These types of statements would have been problematic earnings claims and implied claims under the Vision Online Compliance Guidelines, at 5, which advised avoiding earnings claims posed either as statements or questions because they could imply to

3), this information adequately supports the requested injunctive relief against the Settling Defendants.

Finally, the requested injunctive relief is narrowly tailored based on the Settling Defendants' conduct in this case, and designed to prevent further violations, including: (1) prohibitions on the marketing or selling the type of products and services at issue in this matter – ecommerce and real estate coaching programs;[25] (2) prohibitions relating to earnings claims and consumer reviews and complaints;[26] (3) prohibitions concerning other deceptive business practices used by the Settling Defendants, such as (i) misrepresenting that consumers will learn everything they need to know to make substantial income at a workshop or event, (ii) that the Settling Defendants need detailed financial information from consumers to determine if the consumers qualify for a good or

---

consumers what they could expect by the end of the three-day training, e.g., "You will learn how to make five to ten thousand dollars a month before you leave the three-day live event" (statement) or "[H]ow many of you would like to learn how to make five to ten thousand dollars by the time you leave the three-day event? (question)." *See* Shiller II at ¶¶ 44-46, attaching a copy of the Vision Online Compliance Guidelines as Attachment H to Shiller II.

[25] Stipulated Orders, Section III. "If a defendant is found in violation of the FTC Act, then the defendant must expect some fencing in." *FTC v. Romero*, 658 F.Supp.3d 1129, 1147 (M.D. Fla., Feb. 27, 2023) (internal citations omitted). *See also RCA Credit Servs.*, LLC, 727 F. Supp. 2d at 1335 (citing *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 395 (1965) ("The Commission is not limited to prohibiting the illegal practice in the precise form in which it is found to have existed in the past. Having been caught violating the [FTC] Act, respondents must expect some fencing in.") (internal quotation marks and citations omitted)). This Court has granted similar relief in past FTC cases. *See FTC v. GDP Network LLC*, No. 6:20-cv-1192-WWB-DCI (M.D. Fla. July 10, 2020) and *FTC v. Qualpay, Inc.*, No. 6:20-cv-00945-WWB (M.D. Fla. June 1, 2020). Courts in this district have also ordered similar relief. *See FTC, et al, v. Treashonna P. Graham, et al.*, No. 3:22-cv-655-MMH-JBT (M.D. Fla., Jan. 1, 2023) and *FTC v. Michael Rando, et al*, No. 3:22-cv-487-TJC-MCR (M.D. Fla. Jan. 10, 2023).

[26] Stipulated Orders, Sections IV and VII.

service, and (iii) advising consumers to increase their credit card limit or apply for additional credit cards to finance the purchase of any Business Opportunity or Investment Opportunity;[27] (4) prohibitions on the sale or transfer of consumer data obtained by the Settling Defendants; [28] (5) a cooperation clause; [29] and (6) standard order acknowledgement, monitoring and reporting provisions that allow the FTC to ensure that the Settling Defendants comply with the Stipulated Orders.[30]

### C. Rule 65 Authorizes the Court To Grant Relief Against The Settling Defendants' Agents, Employees, And Other Persons In Active Concert Or Participation With Them

Sections IV through VII and Section X of the Stipulated Orders seek narrowly tailored injunctions against persons in "privity" with the Settling Defendants, such as those listed in Federal Rule of Civil Procedure 65(d), including officers, agents, and employees. Rule 65 allows the Court to grant such a relief against the Settling Defendants' agents, employees, and all other persons in active concert or participation with them to ensure

---

[27] Stipulated Orders, Sections V, VI.

[28] Stipulated Orders, Section X.

[29] Stipulated Orders, Section XI.

[30] Corporate/Alvarez Stipulated Order, Sections XV – XVIII and Chamberlain Stipulated Order, Sections XII - XV. Final orders in FTC enforcements actions have regularly included monitoring provisions to ensure compliance with permanent injunctions.   *See, e.g.*, *FTC v. GDP Network LLC*, No. 6:20-cv-1192-WWB-DCI, ECF 107, Sections IX – XII; *FTC v. Qualpay, Inc.*, No. 6:20-cv-00945-WWB, ECF 27, pp. 20-24; *FTC, et al, v. Treashonna P. Graham, et al.*, No. 3:22-cv-655-MMH-JBT, ECF 76, Sections VII-X; *and FTC v. Michael Rando, et al*, No. 3:22-cv-487-TJC-MCR, ECF 116, Sections VIII-XI.   *See also FTC v. Capital Choice Consumer Credit, Inc.*, No. 02-21050, 2004 WL 5141452, at *4 (S.D. Fla. May 5, 2004) ("It is well settled that 'record-keeping and monitoring provisions . . . are . . . appropriate to permit the Commission to police the defendants' compliance with the order.'" (*quoting FTC v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1276 (S.D. Fla.1999)).

that the Settling Defendants "may not nullify [the injunction] by carrying out prohibited acts through aiders and abettors [that] were not parties to the original proceeding."  *FTC v. Leshin*, 618 F.3d 1221, 1235–36 (11th Cir. 2010) (quoting Fed. R. Civ. P. 65(d)(2)) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

### D. The Court Has Equitable Authority To Appoint A Receiver To Liquidate The Assets Of The Receivership Entities, Including Those Not Parties To This Litigation

"A district court has 'broad powers and wide discretion to determine relief in an equity receivership.'"  *SEC v. Quiros*, 966 F.3d 1195, 1199 (11th Cir. 2020) (*quoting SEC v. Elliott*, 953 F.2d 1560, 1566 (11th Cir. 1992)).  "A receiver … acts on behalf of the receivership entities to gather and collect assets for the court to distribute to those entitled to the funds, often the [consumers] injured" by the deceptive scheme.  *SEC v. Nadel*, 2012 WL 12910270, *5 (M.D. Florida, April 25, 2012)).[31]  The Court's broad equitable powers allow it to authorize its appointed receiver to expand the receivership over non-parties and ultimately use their assets for consumer redress.

District courts in similar matters have often determined that expansion of a receivership over nonparties is necessary to effectively safeguard assets for victims.[32]

---

[31] *See also SEC v. Xia*, 2024 WL 3592170, *10 (E.D.N.Y., July 26, 2024) (citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972), abrogated on other grounds by *SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023) for the proposition that the appointment of a trustee "to receive [ ] funds, to distribute them to defrauded public investors[,] and to report to the court on the true state of affairs was an appropriate exercise by the district court of its equity powers" (internal quotation marks omitted).

[32] *See, e.g., SEC v. MJ Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 127227, *6–*7 (S.D. Fla. Mar. 18, 2022) (finding that expansion of a receivership over non-party entities because the companies "were used as an instrumentality of [the] scheme and received

17

Receiverships have been expanded by use of the alter ego doctrine to include entities related to defendants where funds have been commingled or corporate assets used for personal purposes.[33]   And courts in this district have approved the extension of receiverships to exercise control over third party entities holding property that was purchased with defendants' "scheme proceeds."[34]

As noted in the receiver's Notice of Expansion of Receivership, filed on July 28, 2023, the Corporate Defendants provided "several million dollars" to five non-defendant entities wholly or partially owned or controlled by Richard Alvarez: Xebec Group, LLC, XPI Investments, LLC, Key In Homes, LLC, Key In Properties, LLC, and Oak Homes, LLC (ECF 62 at 17–18).   The receiver further noted that "[a]ll, or essentially all, of this cash derived from the operations of the Ganadores entities[.]" *Id.*   Upon determining that the entities held millions in Vision Online funds and met the definitions of "monitored entities" in the TRO and "receivership entities" in the stipulated preliminary injunction, the monitor/receiver expanded the monitorship/receivership over them following proper notice.   These decisions of the monitor/receiver with respect to those five entities were never challenged.   In sum, it is within the equitable powers of the Court to allow the receiver (as it did in the TRO and the stipulated preliminary injunction)

---

substantial investor funds"); and *SEC v. Complete Bus. Sols. Grp.*, 2020 WL 9209279, at *2 (S.D. Fla. Dec. 16, 2020) (expanding a receivership based on findings that "tainted funds, which could be the subject of disgorgement, may be found in the entities and properties identified herein").

[33]  *See, e.g.*, *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231 (D. Nev. 1985), *aff'd* 805 F.2d 1039 (9th Cir. 1986).

[34]  *See SEC v. Nadel*, No. 8:09-cv-87-T-26TBM, 2013 WL 2291871, at *2 (M.D. Fla. May 24, 2013) (third party entity's use of scheme proceeds to purchase oil and gas leases subjected it to inclusion in receivership despite that it was not an alter ego of defendant).

to expand the receivership over nonparties.   And those powers also allow the Court to authorize the receiver to execute the liquidation called for by the Stipulated Orders so that the resulting funds can be used for consumer redress.

### III.  REQUEST FROM ALVAREZ DEFENDANTS[35]

This case has been pending since June 3, 2023.   Since the commencement of this case, the individual Settling Defendants have been living in a state of legal and financial uncertainty.   They have incurred significant collateral costs from the pendency of the matter, and legal expenses in connection with the various legal proceedings and case developments that have transpired in that time.

The Alvarezes signed their settlement agreement with the FTC on October 31, 2023, which was subsequently filed on January 17, 2024.   In the intervening 8 months, the Court has ordered the parties to address certain procedural and substantive matters, all of which the parties have addressed promptly and in compliance with the Court's ordered timeframe.   The Alvarezes respectfully request that the Court consider the instant Joint Motion as expediently as possible to provide the parties, hopefully, with some certainty in the case.

### IV. CONCLUSION

For the foregoing reasons, the Court has authority to grant the relief included in the Stipulated Orders.

---

[35] This section was authored by the attorneys at Cozen O'Connor to express the views of their clients, Richard and Sara Alvarez.

19

CERTIFICATE OF GOOD FAITH CONFERRAL

Pursuant to Local Rule 3.01(g), the FTC and the Corporate Defendants and Alvarez Defendants have conferred with all Defendants who have appeared in this matter, directly or through counsel, and the Receiver regarding the relief requested herein.   None oppose this motion.[36]

Respectfully submitted,              Date:   August 26, 2024

*/s/ Meghan Stoppel*
Meghan Stoppel, Nicole Sprinzen, and
Arielle Sara Eisenberg
Cozen O'Connor
707 17th Street, Suite 3100
Denver, CO 80202
phone (720) 479-3880
fax (720) 539-7882
MStoppel@cozen.com
NSprinzen@cozen.com
AEisenberg@cozen.com

*Counsel for Richard Alvarez and Sara Alvarez*

*/s/ J. Ronald Brooke, Jr*.
Virginia Rosa
J. Ronald Brooke, Jr.
Federal Trade Commission
600 Pennsylvania Ave, NW
Mailstop CC-8528
Washington, DC 20580
(202) 326-3068 / vrosa@ftc.gov
(202) 326-3484 /
jbrooke@ftc.gov
(202) 326-3395 (fax)
*Attorneys for Plaintiff*
*Federal Trade Commission*

---

[36] Defendant Shemin does not oppose the relief sought in this Motion.   However, he has requested that the following be noted: "Because Mr. Shemin disputes the legal and factual basis of the FTC, the FTC's motion and proposed order is not intended nor shall be construed to apply to or bind Mr. Shemin or to prejudice Mr. Shemin from subsequently opposing the FTC's purported legal and factual basis or requested relief that might be argued against Mr. Shemin in the future."

20

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 26, 2024, a copy of the foregoing document was served on the following counsel of record via the CM/ECF system and on Mr. Chamberlain, the *pro se* defendant, via email:

Meghan Stoppel, Nicole Sprinzen, and
Arielle Sara Eisenberg
Cozen O'Connor
707 17th Street, Suite 3100
Denver, CO 80202
phone (720) 479-3880
fax (720) 539-7882
MStoppel@cozen.com
NSprinzen@cozen.com
AEisenberg@cozen.com

*Counsel for Richard Alvarez and Sara Alvarez*

Mark J. Bernet
Akerman LLP
401 E. Jackson Street
Suite 1700
Tampa, FL 33602
phone (813) 209-5026
fax (813) 223-2837
mark.bernet@akerman.com

*Receiver*

Bryce Chamberlain
chamberlainbryce@gmail.com
*Pro Se*

Jason McNeill
McNeill Von Maack
236 South 300 East
Salt Lake City, Utah 84111
mcneill@mvmlegal.com

*Counsel for Robert Shemin*

/s/ J. Ronald Brooke, Jr
J. Ronald Brooke, Jr.
Attorney for Plaintiff

21