UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FEDERAL TRADE COMMISSION,

        Plaintiff,

vs.                              Case no. 6:23-cv-1041-WWB-DCI

VISION ONLINE, INC., et al.,

        Defendants.

_____/

## RECEIVER'S UNOPPOSED VERIFIED FOURTH APPLICATION FOR PAYMENT FOR SERVICES RENDERED AND COSTS INCURRED

Mark J. Bernet (the "Receiver"), as receiver for the Defendants Vision Online, Inc., Ganadores IBR, Inc., Vision Online Digital, LLC, Vision Online English, LLC, and Vision Online Latino, LLC, as well as for the non-parties Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC and XPI Investments, LLC (collectively the "Receivership Entities"), files his fourth application for payment for services rendered and reimbursement for costs incurred. As discussed in more detail below, the Receiver requests payment of $91,442.50 in fees incurred during the period commencing April 6, 2024, through and including January 31, 2025 (the "Fourth Interim Fee Period"). The Receiver further requests that the Court authorize reimbursement to the Receiver for $233.16 in costs incurred. **The Receiver reports to the Court that the relief requested herein is not opposed by any of the parties.[1]**

_____

[1] The Alvarez Defendants (Richard Alvarez and Sara Alvarez) do not recognize the Receiver as receiver for the non-parties Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC and XPI Investments, LLC, but they do not oppose the relief requested in this motion.

The Receiver submits the following in support of his Fourth Interim Fee Application.

I.      INTRODUCTION

    A.      The Relief Requested

        1.      By this Fourth Application the Receiver requests authority to pay himself $91,442.50 for his services rendered as receiver during the Fourth Interim Fee Period, and $233.16 as reimbursement for costs incurred.  The fees represent 231.5 hours expended by the Receiver over the Fourth Interim Fee Period at a proposed hourly rate of $395.00.[2]

        2.      The services rendered during the Fourth Interim Fee Period are discussed in greater detail in Section II below.  Additionally, the Receiver has filed a summary of the billable time expended on this case, together with a detailed billing log, recorded in tenths of an hour, for all tasks undertaken.  See Exhibit "A."

        3.      All the services for which the Receiver requests compensation were rendered solely in connection with this case and solely by the Receiver.  All the services that are the subject hereof were rendered during the Fourth Interim Fee Period.

        4.      The Receiver received no retainer for professional fees and costs in connection with his services herein.  The Receiver has agreed to wait for a Court order before taking payment.  This is the Receiver's fourth request for payment.  The Court previously awarded the Receiver the following:

_____

[2] The proposed hourly rate represents a discount of over $400.00 from the Receiver's 2023 standard rate of $860.00/hour.  The Receiver's law firm, Akerman, increased his standard hourly rate for 2024 to $960.  For 2025, the Receiver's standard hourly rate is $1,040.

- By its *Order* entered on November 20, 2023 (doc. no. 108), the Court awarded the Receiver $82,871.00 in fees and $15,803.81 as reimbursable expenses.

- By its *Order* entered on May 31, 2024 (doc. no. 150), the Court awarded the Receiver $93,457.00 in fees and $2,186.81 as reimbursable expenses.

- By its *Order* entered on November 18, 2024 (doc. no. 173), the Court awarded the Receiver $99,026.50 in fees and $463.71 as reimbursable expenses.

5.    The Receiver respectfully submits, considering the difficult, complex and time-consuming nature of this case, that the requested compensation is fair and reasonable.

B.    The Background of the Case.

The Plaintiff filed its Complaint (doc. no. 1) on June 5, 2023, alleging that the Defendants[3] operated as a common enterprise to engage in a business or business venture in violation of (i) Section 5 of the FTC Act, 15 U.S.C. §45(a), (ii) the Business Opportunity Rule, 16 C.F.R. Part 437, (iii) the Cooling Off Rule, 16 C.F.R. Part 429,  and (iv)  the Consumer Review Fairness Act of 2016, 15 U.S.C. §45b.[4]

---

[3] The term "Organizational Defendants" means Defendants Vision Online, Inc., Ganadores IBR, Inc., Vision Online Digital, LLC, Vision Online English, LLC and Vision Online Latino, LLC.  The term "Individual Defendants" means Defendants Richard Alvarez, Sara Alvarez, Robert Shemin and Bryce Chamberlain.
[4] Discussions concerning these statutes and regulations are contained in the *Receiver's Initial Report* (doc. no. 62), filed August 4, 2023.

On June 7, 2023, the Court entered an *Order* (doc. no. 11) constituting a temporary restraining order, which was extended by the Court's June 16, 2023 *Order* (doc. no. 19) (together the two orders shall be referred to as the "TRO").   Among other things, the TRO enjoined the Defendants from engaging in, or directing, any business activities that violated any of the federal laws and rules mentioned above.  The TRO also appointed Mark J. Bernet as a temporary monitor to review, monitor and analyze the business practices of the Organizational Defendants to and recommend whether they could be operated "legally and profitably."

By his June 15, 2023 *Notice of Expansion of Monitorship* (doc. no. 18), and as authorized by the TRO,[5] the Monitor expanded the monitorship to include Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC, and XPI Investments, LLC, (the "Additional Monitored Entities" or the "Additional Receivership Entities").   The Organizational Defendants and the Additional Monitored Entities collectively are referred to as the "Monitored Entities" or as the "Receivership Entities."

On July 6, 2023, the FTC and the Defendant Chamberlain filed a *Joint Stipulation to Entry of Stipulated Preliminary Injunction Order as to Defendant Bryce Chamberlain* (doc. no. 31), by which they requested that the Court enter an agreed preliminary injunction pertaining to Chamberlain. The Court has approved the stipulation.

---

[5] The provision is contained in the June 7, 2023 *Order*, beginning on page 22.

On July 14, 2023, the FTC, the Organizational Defendants, and the Individual Defendants R. Alvarez and S. Alvarez filed a *Joint Stipulation to Entry of Stipulated Preliminary Injunction Order as to Defendants Vision Online, Inc., Ganadores IBR, LLC, Vision Online Digital, LLC, Vision Online English, LLC, Vision Online Latino, LLC, Richard Alvarez, and Sara Alvarez* (doc. no. 47) requesting that the Court enter an agreed preliminary injunction pertaining to the Organizational Defendants and the Individual Defendants R. Alvarez and S. Alvarez. The Court approved the stipulation by its order dated July 18, 2023 (doc. no. 52). This order hereafter will be referred to as the "Preliminary Injunction." Among other things, the Preliminary Injunction appointed the Monitor as receiver for the Receivership Entities.

On July 26, 2023, the FTC and the Defendant Shemin filed a *Joint Stipulation to Entry of Stipulated Preliminary Injunction as to Defendant Robert Shemin* (doc. no. 56), by which they requested that the Court enter an agreed preliminary injunction as to Shemin. The Court approved the stipulation by its *Order* dated August 1, 2023 (doc. no. 59).

By his July 28, 2023 *Notice of Expansion of Receivership* (doc. no. 58), and as authorized by the Preliminary Injunction, the Receiver expanded the receivership to include Key In Homes, LLC, Key In Properties, LLC, Oak Homes, LLC, Xebec Group, LLC, and XPI Investments, LLC, (the "Additional Receivership Entities"). Neither Alvarez nor any other party or person objected to the expansion of the receivership to include any

of these Additional Receivership Entities, as was permitted under Section XII.U of the Preliminary Injunction (page 26).[6]

On March 14, 2024, the FTC, the Organizational Defendants, and the Individual Defendants Richard Alvarez and Sara Alvarez filed a *Joint Motion for Entry of Stipulated Order for Permanent Injunction and Monetary Judgment as to the Corporate Defendants and Alvarez Defendants* (doc. no. 121). The same day, the FTC and the Individual Defendant Chamberlain filed a *Joint Motion for Entry of Stipulated Order for Permanent Injunction and Monetary Judgment as to Defendant Chamberlain* (doc. no. 122). By these joint motions the parties requested entry of orders from the Court approving and ordering a settlement between those parties involving, among other things, a permanent injunction and a money judgment for over $29 million (with significant portions suspended assuming the Settling Defendants' compliance with the provisions of the proposed order approving the settlement). By its *Order* dated August 2, 2024 (doc. no. 155), the Court denied the motions without prejudice, stating that notwithstanding the parties' agreement "[t]he parties' Motions fail to provide sufficient argument or evidence to justify the requested relief under [15 U.S.C. §§53(b) & 57b]." The Court further directed the parties to show cause why the case should not be dismissed for failure to comply with Local Rule 3.09(b). On August 12, 2024, the Court discharged its order to show cause and directed the FTC, the Alvarez Defendants and Chamberlain to file an amended motion seeking approval of their settlement.

---

[6] The summary procedures established in the Preliminary Injunction are appropriate for equity receivership cases such as this. *SEC v. Elliott*, 953 F.2d 1560 (11th Cir. 1992); *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985)

Thereafter, on August 26, 2024, the Organizational Defendants, and the Individual Defendants Richard and Sara Alvarez and Chamberlain filed a *Renewed Joint Motion for Entry of Stipulated Order for Permanent Injunction and Monetary Judgment as to the Corporate Defendants, Alvarez Defendants and Chamberlain* (doc. no. 159) ("Renewed Motion"), by which the parties supplied additional argument and evidence to support entry of an order approving their voluntary settlement.  In its November 18, 2024 *Order* (doc. no. 174, the Court granted the Renewed Motion in part, entering a final judgment against the Alvarezes and Chamberlain for $29,175,000 and permanently enjoining them from essentially the same actions from which they were enjoined under the Preliminary Injunction.  The Court, however, ruled that, notwithstanding the parties' agreement, the Plaintiff was not entitled to the appointment of a receiver over the Additional Receivership Entities.  The Court did not address the Receiver's inclusion of the additional Receivership Entities in receivership.

The Receiver has made and maintained detailed records of his activities during the Fourth Interim Fee Period.  Annexed as Exhibit "A" is a statement showing (i) the time spent by the Receiver on each task he performed, recorded in tenth-of-an-hour time increments, (ii) the date of each task, and (iii) a description of each task.[7]  Exhibit "A" also shows the Receiver's actual out-of-pocket expenses incurred during the Third Interim Fee Period.  Exhibit "A" was prepared by the Receiver in the ordinary course of business, as part of his regularly conducted business activities.  Exhibit "A" was made by the Receiver.  Each entry was made at or near the time of each event described.  Exhibit

---

[7] In this regard, the Receiver generally has recorded, and seeks compensation for, only approximately 90 percent of the actual time he spent on the case.

"A" has been maintained by the Receiver, and it is his usual practice to make and maintain such records, and to retain custody and control over such records.

II.    EVENTS OF THE MONITORSHIP/RECEIVERSHIP

The Receiver devoted a significant amount of time to this matter during the Fourth Interim Fee Period handling diverse issues, including the following.

A.    Reports.

During the Fourth Interim Fee Period the Receiver completed and filed the *Receiver's Second Interim Report, Concerning the Properties and Tax Concerns* (doc. no. 128), in which he provided to the Court and the parties a detailed analysis of the various real properties owned by the Receivership Entities. The Receiver also included a discussion concerning tax issues associated with Vision Online's pre-receivership tax returns that may have improperly reported or accounted for distributions from Vision Online. Finally, the Receiver attached his bank account ledgers for the Receivership Entities showing all income and expenditures during the case. The Alvarez Defendants filed an objection to the report arguing, essentially, that the Receiver's characterization of the properties, insofar as they were critical of Alvarez, were erroneous.[8]

B.    Real Property Analysis, Sale Efforts.

The Receiver continued to devote significant time analyzing various properties owned by Vision Online, Ganadores, and the Additional Receivership Entities, as well as joint venture arrangements in which the Additional Receivership Entity Oak Homes participated. As noted in the *Monitor's/Receiver's Initial Report* (doc. no. 62),

---

[8] Neither the Federal Rules of Civil Procedure, nor the Local Rules of Court for the Middle District of Florida, authorizes a party to file any "objection" to a receiver's report.

Vision Online engaged in a real estate coaching business, a real estate investing business, and a real estate lending business. The revenue source for purchasing all of the properties was Vision Online's real estate coaching business; Vision Online then used those funds to purchase properties in its own name, or it "loaned" money to affiliates to enable them to purchase real estate. These loans were not documented, which caused concern that there was no enforceable repayment obligation.[9] The Receiver documented most of the transactions as lines of credit loans secured by recorded mortgages.

During the Fourth Interim Fee Period, the Receiver listed and/or sold the following properties:

1.  <u>West Palm Beach</u>. Prior to this lawsuit Vision Online advanced money to the Additional Receivership Entity Xebec Group, LLC ("Xebec") to enable it to purchase property located at 4444 Washington Road, West Palm Beach, Florida (the "WPB Property"). The plan was to demolish the existing structure and construct a new home. Construction was in its final stages when Vision Online and Xebec went into receivership.

The Receiver listed the property for sale for $4.7 million, or approximately 10 percent less than the price Alvarez had listed it prior to the lawsuit. There was no interest. The Receiver lowered the price to $3,995,000 which, coupled with the onset of the Spring/Summer selling season, caused an uptick in interest from potential purchasers. Ultimately, the Receiver entered into a contract to sell the property for $3.6 million.

---

[9] Vision Online had created no promissory notes or other written documents or instruments to evidence the loans; instead, money transferred from Vision Online was simply recorded as intercompany transfers on Vision Online's income statement.

The Additional Receivership Entity Xebec, the owner of the WPB Property, is a Florida limited liability company originally created by Jason Alexander Fainette ("Fainette") and Gustavo Adolfo Acosta ("Acosta"). Fainette and Acosta met with R. Alvarez, and they agreed to Xebec's purchase of the WPB Property using Vision Online's money. The "understanding" between Fainette, Acosta and R. Alvarez was that, in return for Vision Online providing the capital necessary for Xebec to purchase and rehabilitate the WPB Property, then upon the sale of the property:

- Xebec would repay to Vision Online all of the money Vision Online advanced for acquisition, demolition and construction, without interest;

- Five percent of the profit would be paid to Ivan Arista in return for his financial management of the purchase/demolition/new construction; and

- The remaining profit would be split evenly between Xebec and Alvarez.

This "understanding" placed essentially all of the risk for the venture on Vision Online, which stood to gain, at most, the return of its money without interest. At the same time, Vision Online assumed the risk that the property would not generate sufficient sale proceeds to repay its investment. Conversely, the "upside" under the understanding flowed to Fainette, Acosta and R. Alvarez. This was not in Vision Online's best interest, and so the Receiver repudiated the oral "understanding."

The fact remained, however, that Xebec was and remains owned by Fainette and Acosta, both of whom contributed non-monetarily to the acquisition

10

of the WPB Property and to the construction of the new building. Arista also provided value. Accordingly, for the sake of fairness, the Receiver reached an agreement with Fainette, Acosta and Arista, under which the Receivership Estate paid them $23,500 in satisfaction of their equity interests in Xebec and their claims to any of the sale proceeds. The Court approved the sale of the WPB Property, and the settlement between the Receiver, Fainette, Acosta and Arista by its May 31, 2024 *Order* (doc. no. 151).[10]

   2. <u>Commercial Office Building, Colonial Drive</u>. Prior to this lawsuit Vision Online purchased a commercial office building at 733 W. Colonial Drive, Orlando, Florida (the "Colonial Drive Property") for $910,000. Vision Online made a down payment of approximately $200,000 and took out a mortgage loan for approximately $725,000. As of the Receiver's appointment the Colonial Drive Property was listed for sale for $1.4 million, but there was little interest at that price. During the Third Interim Fee Period, and after conducting further market analysis, the Receiver reduced the listing price to $1,200,000. The Receiver sold the Colonial Drive Property, with the Court's approval (*see Order* dated April 29, 2024 (doc. no. 142)), for $1,120,000. The Receiver then obtained the turnover of approximately $100,000 held by Fifth Third Bank as additional collateral for its mortgage loan to Vision Online relating to the Colonial Drive Property.

---

[10] The sale process was complicated by problems with title to the property (Xebec had failed to obtain and record a necessary disclaimer from the former owner), and with a non-functioning new air conditioning unit (requiring a complete replacement under warranty), as well as a roof water-drainage issue.

3.     <u>Puerto Rico Properties – Key In Homes</u>.  Prior to this lawsuit Vision
Online advanced funds to the Additional Receivership Entity Key In Homes, LLC,
to enable it to purchase property located at 802 Calle Aguamarina, Isabella, Puerto
Rico (the "Aguamarina Property") and 52 Avenue Munoz Rivera, Apt. 1802,
Condominium Aquablue, San Juan, Puerto Rico (the "Aquablue Property").  The
Aguamarina Property was a "container home" that was constructed onsite from a
shipping container with funds from Vision Online (Vision Online has advanced
$800,000 for the acquisition and development of the Aguamarina Property).  The
Aguamarina Property presently is operated as an AirBnB and generates gross
income of approximately $70,000 per year, although net operating income is
approximately half that.  The Aquablue Property is a residential condominium unit
that presently is not leased.  During the Fourth Interim Fee Period the Receiver
analyzed the relevant real estate markets and listed the properties for sale.

4.     <u>Puerto Rico Property – Key in Properties</u>.  Prior to this lawsuit Vision
Online advanced funds to the Additional Receivership Entity Key In Properties,
LLC, to enable it to purchase property located at Calle Julio Flores 96 A, Bo.
Sardinera, Fajardo, PR (the "Fajardo Property).   The purchase price was
$360,000, some of which was paid by the Alvarezes personally (although those
funds derived from Vision Online).  The Fajardo Property is operated as an AirBnB
and generates gross annual revenues of approximately $65,000.   During the
Fourth Interim Fee Period the Receiver analyzed the relevant real estate markets
and hired listing agents.

5.    <u>The Section 8 Properties -- Joint Venture through LGL</u>.  Prior to this lawsuit the Additional Receivership Entity Oak Homes, LLC, became the 50 percent owner of a Michigan limited liability company called LGL Investments, LLC ("LGL").  The other 50 percent owner was a Florida limited liability company known as Smile Collection Rental, LLC.  Oak Homes is an affiliate of Vision Online, having common members and managers (i.e., R. Alvarez), but Smile Collection Rental is not an affiliate.  Oak Homes and Smile Collection Rental each provided funds to LGL to enable LGL to purchase a series of Section 8 housing units[11] located in Detroit.  The first group of seven homes were purchased in February 2023.  All the units required extensive rehabilitation prior to becoming habitable.  LGL purchased a second group of Section 8 properties, totaling another nine units, in June 2023, immediately prior to the initiation of this lawsuit.  For those nine properties, Oak Homes advanced all of the required funding to LGL.[12]  These nine units are uninhabitable, and the Receiver is not prepared to invest the several hundred thousand dollars necessary.

The Receiver and Smile Collection Rental's attorneys engaged in extensive negotiations concerning the properties.  Those negotiations, which included a significant amount of financial analysis by the Receiver, have resulted in a signed term sheet that would involve Oak Home's sale of its interests in LGL.  The sale

---

[11] Section 8 of the Housing Act of 1937 (42 U.S.C. §1437f), as repeatedly amended, authorizes the payment of rental housing assistance to private landlords on behalf of low-income households.
[12] The Receiver was able to convince LGL to fund its half during the Fourth Interim Fee Period.  This amounted to approximately $260,000.

would also include two Section 8 units owned by Vision Online and Ganadores IBR.

C.    Cozen O'Connor Fee Application.

During the Second Interim Fee Period Cozen O'Connor requested that the Receiver pay $175,749.20 for legal services it rendered to the Alvarez Defendants and the Organizational Defendants from the commencement of the litigation through July 18, 2023, the date on which the Court converted the monitorship into a receivership. When the Receiver refused, Cozen O'Connor filed an application with the Court requesting payment of that amount. The Receiver prepared and filed a written response in opposition to the fee application. During the Third Interim Fee Period, Magistrate Judge Irick entered an *Order* (doc. no. 120) denying the motion without prejudice and requesting that the movant address certain specific issues if it chose to refile the motion. Cozen O'Connor then filed a renewed motion requesting the same relief. The Receiver prepared and filed a detailed response. Eventually, the FTC, the Cozen O'Connor firm and the Receiver negotiated a compromise of the dispute, under which Receivership Estate would pay Cozen O'Connor $50,000. The settlement is waiting for court approval.

D.    Tax Issues

During the Third Interim Fee Period the Florida Department of Revenue contacted Vision Online with a threat to initiate collection actions because of Vision Online's failure to pay state taxes. The Receiver contacted Florida DOR and explained that under the Stipulated Preliminary Injunction all collection efforts against the Receivership Entities were stayed.

During the Fourth Interim Fee Period the Receiver continued to analyze Vision Online's purported election, prior to this lawsuit, to be treated as a "C" corporation. The IRS has no record of Vision Online making any election to become a "C" corporation. The Receiver's investigation determined that, in fact, the Individual Defendant Richard Alvarez did not complete the necessary paperwork to make a "C" election for Vision Online. That being the case, Vision Online's 2021 and 2022 tax returns, under which it paid approximately $1 million in federal corporate income tax, will need to be amended. While there may be tax penalties associated with improperly filing as a "C" corporation, Vision Online also would be entitled to a refund of the taxes paid. By the end of the Fourth Interim Fee Period the Receiver's CPA prepared, and the Receiver filed, amended state and federal tax returns for Vision Online for the 2021 tax year. The Receiver anticipates filing amended returns for the 2022 tax year shortly.

F.      <u>Miscellaneous</u>.

During the Fourth Interim Fee Period the Receiver also performed the following miscellaneous matters:

- The Receiver arranged for the Alvarezes to submit their cell phones and laptop computers for imaging.

- The Receiver responded to discovery requests from Shemin's attorneys. This was complicated because, unknown to the Receiver, and without any authority, the Cozen O'Connor firm had already prepared and served responses even though they no longer represented the Receivership Entities.

- The Receiver sold two watches and a Ford F250 truck turned over by the Alvarezes under court order, realizing approximately $68,000.

- The Receiver responded to inquiries from consumers about the status of the case.

III.    STANDARD FOR AWARDING COMPENSATION

The Supreme Court has noted:

> Nor is there any doubt of the power of courts of equity to fix the compensation of their own receivers. That power results necessarily from the relation which the receiver sustains to the court; and, in the absence of any legislation regulating the receiver's salary or compensation, the matter is left entirely to the determination of the court from which [the receiver] derives his appointment. The compensation is usually determined according to the circumstances of the particular case, and corresponds with the degree of responsibility and business ability required in the management of the affairs intrusted to [the receiver], and the perplexity and difficulty involved in that management.

*Stuart v. Boulware*, 133 U.S. 78, 81-82 (1890). To determine reasonable compensation for a receiver, a court should employ the familiar lodestar approach by calculating a reasonable hourly rate in the relevant market and a reasonable number of hours expended. *S.E.C. v. Aquacell Batteries, Inc.*, 2008 WL 276026 (M.D. Fla. 2008). This figure then should be adjusted by examining the following factors: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the services properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and the ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the

professional relationship with the client; and (12) awards in similar cases. *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974).[13]

      A.    <u>The Time and Labor Required</u>.  The time and labor required are reflected in the attached Exhibit "A."  In this case the activities performed during the Fourth Interim Fee Period required a significant amount of the Receiver's time and attention.  As discussed above, the Receiver expended a total of 231.5 hours in connection with the services he rendered during the Fourth Interim Fee Period.  The Receiver generally recorded only approximately 90 percent of his actual time to try to provide efficiencies to this case.  Additionally, the Receiver did not record time spent traveling between Tampa and Orlando on four occasions.

      B.    <u>The Novelty and Difficulty of the Question</u>.  Investigating the business practices of the Receivership Entities required the Receiver to draw upon all of his judgment, expertise and substantive legal and business knowledge, including specialized knowledge in the real estate and construction industries.  In particular, the Receiver spent considerable effort understanding regulations that implemented Section 8 of the Federal Housing Act of 1937.  The Receiver also spent efforts understanding and implementing tax regulations governing Qualified Settlement Funds (*see* 26 C.F.R. Part 1.468B-1).  The Receiver notes that he is not fluent in Spanish, which made it somewhat more difficult for him to process videos and documents.[14]

---

[13] Decisions from the former Fifth Circuit Court of Appeals entered prior to September 30, 1981, are binding precedent in the Eleventh Circuit.  *Bonner v. City of Pritchard*, 661 F.2d 1206 (11th Cir. 1981).

[14] Vision Online employees Ivan Reybel, Carmen Gonzalez and Von Marie Cardoso were patient and helpful in assisting the Receiver in this regard.

C.    <u>The Skill Necessary to Perform the Services Properly</u>.    Again, analyzing, evaluating and shutting down the Defendants' real estate coaching business, attempting to unravel hundreds of transfers of funds between the Defendants and third parties, and determining appropriate valuations for properties that the Receiver listed for sale, and then sold, presented unique challenges.

D.    <u>The Preclusion of Other Employment</u>.    During the Fourth Interim Fee Period the Receiver devoted a significant amount of his time to this matter, and as a result he was unable to work on other matters in which his clients had agreed to pay higher hourly rates than the $395 requested herein.    The Receiver also notes that his recorded time does not include time he spent traveling (on I-4!) between Tampa and Orlando.

E.    <u>The Customary Fee</u>.    The fees requested by the Receiver are those that are charged for similar services, except that, in this case the Receiver discounted his 2023 standard hourly rate by $465.00 per hour.    The Receiver also generally recorded only 90 percent of the time he spent working on matters.    The Receiver submits that, as an attorney, he has been able to provide the receivership estate with certain efficiencies that a non-attorney Receiver would not be able to provide; in particular, the Receiver personally handled many if not most of the legal issues that have arisen (at his discounted hourly rate) himself.

Regarding the appropriate hourly rate, the Court is familiar with the local market and can determine an appropriate rate without further evidence.    *Norman v. Housing Authority of the City of Montgomery*, 836 F.2d 1292, 1303 (11th Cir. 1988) (quoting *Campbell v. Green*, 112 F.2d 143, 144 (5th Cir. 1940)).    The Receiver notes that in the materials presented to the Court in support of the Plaintiff's motion to appoint the

Receiver, the Plaintiff accurately represented that the Receiver had agreed to accept the hourly rate of $395.00.  The Court has previously determined in this case that $395.00 is a reasonable hourly rate for the Receiver.

   F. <u>Whether the Fee is Fixed or Contingent</u>.  The fees requested are not contingent; however, they are subject to this Court's approval prior to being paid.

   G. <u>Time Limitations Imposed by the Client</u>.  No extraordinary consideration need be given to this factor.

   H. <u>The Amount Involved and the Results Obtained</u>.  The Receiver recovered more than $5 million cash, as well as properties not yet sold that the Receiver preliminarily estimates could be worth another $2 million or more (net of third-party mortgages and sale costs).  The funds recovered will be used to fund the receivership estates, and for consumer redress.

   I. <u>The Experience, Reputation and Ability of the Receiver</u>.  The Receiver is a 1986 graduate of the Notre Dame Law School, where he was a member of the Notre Dame Law Review.  The Receiver holds an AV rating from Martindale Hubbell as an attorney.  The Receiver has been recognized as Lawyer of the Year by Best Lawyers in America for the Tampa Bay region for two of the past three years.  Over the past 20+ years the Receiver has served as a receiver for well over 180 entities in more than 20 receivership appointments in cases involving allegations of fraudulent misconduct and unlawful business practices, such as are involved this case, from courts located in Florida, Georgia and Illinois.

   J. <u>The "Undesirability" of the Case</u>.  The case involved a very significant time commitment, but otherwise this factor need be given no extraordinary consideration.

K.    <u>The Nature and Length of the Professional Relationship</u>.    The Receiver reports to the Court, and accordingly there is no "professional relationship" within the usual meaning of the phrase.  However, as noted above, for more than 20 years the Receiver regularly has been appointed as receiver by this and other courts for companies allegedly involved in fraudulent conduct.

L.    <u>Awards in Similar Cases</u>.  It is customary for a court to award a receiver the fees requested, particularly where the receiver has performed as directed and has requested a reasonable amount.

IV.    <u>EXPENSES</u>

During the Fourth Interim Fee Period the Receiver incurred reimbursable expenses totaling $233.16.  These are itemized on the attached Exhibit "A."  They include charges for Federal Express deliveries, and mileage reimbursements (utilizing the 2023 and 2024 IRS-approved reimbursement rate).

V.    <u>CONCLUSION</u>

As set forth above, during the Fourth Interim Fee Period the Receiver recorded 231.5 hours of billable time.  At the agreed hourly rate of $395.00, this would result in fees of $91,442.50.  Additionally, during the Third Interim Fee Period the Receiver incurred reimbursable expenses of $233.16.   No parties have advised of any substantive objections to the Receiver's fee application, and the Receiver accordingly requests entry of an order approving the application.

## LOCAL RULE 3.01(g) CERTIFICATION

The Receiver certifies that prior to filing this motion he made a reasonable effort to confer with all parties who may be affected by the relief requested herein.  All counsel (and the Defendant Chamberlain, who is unrepresented) advised that they do not object to the relief requested herein.  The matter therefore is not contested by any of the parties.

## VERIFICATION

The Receiver certifies that all factual statements contained herein are true and correct.

Dated:      Tampa, Florida
            February 14, 2025


                              /s/ Mark J. Bernet_____
                              Mark J. Bernet, Receiver
                              401 E. Jackson Street, Suite 1700
                              Tampa, Florida 33602
                              Telephone:  (813) 223-7333
                              Facsimile:  (813) 218-5495
                              Email:  mark.bernet@akerman.com
                              Secondary:  caren.deruiter@akerman.com

<u>CERTIFICATE OF SERVICE</u>

I certify that a copy of the foregoing was served by CM/ECF and via e-mail to J. Ronald Brooke, Esquire, e-mail jbrooke@ftc.gov; Virginia Rosa, Esquire, e-mail vrosa@ftc.gov; Arielle S. Eisenberg, email: aeisenberg@cozen.com; Nicole H. Sprinzen, email: nsprinzen@cozen.com; Meghan E. Stoppel, email: mstoppel@cozen.com; Robert Shemin, email: shemin.robert@gmail.com; and Bryce Chamberlain, email chamberlainbryce@gmail.com, this 14th day of February, 2025.

*/s/ Mark J. Bernet*
     Mark J. Bernet, Receiver